RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0063p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

BOONE COUNTY REPUBLICAN PARTY EXECUTIVE
COMMITTEE, HARDIN COUNTY REPUBLICAN PARTY
EXECUTIVE COMMITTEE, and JESSAMINE COUNTY
REPUBLICAN PARTY EXECUTIVE COMMITTEE,

　　　　　　　　　　*Plaintiffs-Appellants*,

　　　　*v.*

H. DAVID WALLACE, LAURA MARIE BENNETT, JESSICA
BURKE, RICHARD LARKIN, ADRIAN MENDIONDO,
THOMAS O'BRIEN, J. BISSELL ROBERTS, and JOHN
STEFFEN, in their official capacities as board members
of the Kentucky Registry of Election Finance,

　　　　　　　　　　*Defendants-Appellees*.

⎤
⎟
⎟
⎟
⎟
⎟
⎟
⎬　No. 24-5783
⎟
⎟
⎟
⎟
⎟
⎟
⎦

─────────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Frankfort.
No. 3:24-cv-00049—Gregory F. Van Tatenhove, District Judge.

Argued:  December 4, 2024

Decided and Filed:  March 18, 2025

Before:  MOORE, GILMAN, and GRIFFIN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Christopher Wiest, CHRIS WIEST, ATTY AT LAW, PLLC, Covington, Kentucky, for Appellants.  Leslie M. Saunders, KENTUCKY REGISTRY OF ELECTION FIANANCE, Frankfort, Kentucky for Appellees.  **ON BRIEF:**  Christopher Wiest, Theodore J. Roberts, CHRIS WIEST, ATTY AT LAW, PLLC, Covington, Kentucky, Thomas Bruns, BRUNS CONNELL VOLLMAR ARMSTRONG LLC, Cincinnati, Ohio, for Appellants.  Leslie M. Saunders, KENTUCKY REGISTRY OF ELECTION FIANANCE, Frankfort, Kentucky for Appellees.  Matthew F. Kuhn, John H. Heyburn, Elizabeth Hedges, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Amicus Curiae.

　　　MOORE, J., delivered the opinion of the court in which GILMAN, J., concurred. GRIFFIN, J. (pp. 32–40), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.  Three Kentucky Republican Party county executive committees ("the executive committees") challenge the Kentucky Registry of Election Finance's ("the Registry") requirement that they register as a political issues committee to expend funds in support of a state constitutional amendment that was on the November 2024 general-election ballot.  The district court denied the executive committees' application for a preliminary injunction.  Because we initially construed the Registry's requirement as a ban on the executive committees' speech, we granted an injunction pending appeal of the preliminary-injunction denial.  Upon further briefing and oral argument, we now conclude that the Registry has imposed only a disclosure requirement on the executive committees, which is sufficiently tailored to the Registry's interests in providing the public with timely and accurate information about ballot-issue campaigns.  We accordingly **AFFIRM** the district court's denial of the motion for a preliminary injunction.

## I.  BACKGROUND

### A.  Statutory and Regulatory Framework

This case concerns the constitutionality of a part of Kentucky's campaign-finance regime and the Registry's interpretation and enforcement thereof.  Accordingly, some background is in order.  The Registry is a state agency charged with regulating campaign-finance disclosures and investigating and civilly prosecuting campaign-finance violations.  Ky. Rev. Stat. § 121.120(1). The Registry may investigate and civilly prosecute state campaign-finance violations "[u]pon the sworn complaint of any person, or on its own initiative."  *Id.* § 121.140(1).  When the Registry has probable cause to believe that a state campaign-finance law has been knowingly violated, the Registry shall refer the case to appropriate state or county authorities for criminal prosecution. *Id.* § 121.140(5).  The Registry also has the power to issue advisory opinions, upon request of any person, "concerning the application" of state campaign-finance law or regulations to a specific transaction or activity.  *Id.* § 121.135(1).  An advisory opinion authorizing the

transaction or activity described in the request may be relied upon by the requestor as a defense to any future enforcement.  *Id.* § 121.135(4).

The Registry regulates campaign activities in part through a statutory taxonomy of "committees" subject to different requirements.  As a general matter, a committee must register with the Registry, "by filing official notice of intention at the time of organization, giving names, addresses, and positions of the officers of the organization, identifying an official contact person of the committee, and designating the candidate or candidates, slate of candidates, or question it is organized to support or oppose on forms prescribed by the registry."  Ky. Rev. Stat. § 121.170(1).  Committees must designate a campaign treasurer, who must designate a depository bank to hold contributions, maintain records of contributors and contributions, make or authorize expenditures, and maintain records for six years from the final date of filing.  *Id.* §§ 121.160(1)–(2), 121.170(3).

One type of committee is a "[p]olitical issues committee," which is defined as "three (3) or more persons joining together to advocate or oppose a constitutional amendment or public question which appears on the ballot if that committee receives or expends money in excess of one thousand dollars ($1,000)."  Ky. Rev. Stat. § 121.015(3)(d).  Within five days of meeting the statutory definition of a political issues committee, that group must submit a form to the Registry indicating whether it intends to raise or spend more than $5,000 in any one election.  *Id.* § 121.180(1)(a)(1).  Political issues committees may receive unlimited contributions, including contributions from corporations.  *Id.* § 121.150(18); *see id.* § 121.150(11).  Funds must be expended on the particular issue, such as a constitutional amendment, for which they are raised, and any excess funds following an election must be returned to contributors, escheated to the State Treasury, donated to charity, or spent on future advocacy related to the same issue.  *Id.* § 121.180(10)(a), (d).  Political issues committees that intend to raise or spend more than $5,000 must report in the run-up to the election—60 days, 30 days, and 15 days before the election day. *Id.* § 121.180(3)(b).  By contrast, political issues committees intending to raise or spend less than $5,000 must report on their receipts and expenditures only after an election ends (within 30 days of the election).  *Id.* § 121.180(4).

The other type of committee relevant here is an executive committee of a political party. An executive committee is not defined by statute, but a Kentucky regulation defines it as

> an organizational unit or affiliate recognized within the document governing a political party, that raises and spends funds to promote political party nominees, and performs other activities commensurate with the day-to-day operation of a political party, including voter registration drives, assisting candidate fundraising efforts, holding state conventions or local meetings, and nominating candidates for local, state, and federal office.

32 Ky. Admin. Reg. 1:050, § 1(1). Executive committees may not accept corporate contributions or contributions in excess of $5,000 from any one person. Ky. Rev. Stat. § 121.150(11)(b), (18).

Executive committees generally report on a schedule that is not tethered to the election cycle. On an annual or semiannual basis, executive committees must make a full public report of all money received from any source and all expenditures made. *Id.* § 121.180(2)(a). Such reports must be made on an annual basis for executive committees with less than $10,000 in their campaign account and on a semiannual basis for executive committees with more than $10,000. *Id.* § 121.180(2)(c). If an executive committee contributes directly to a candidate, the executive committee is not required to make any special disclosure. However, the candidate must report the contribution on the same schedule as required of political issues committees. *Id.* § 121.180(3). If an executive committee makes independent expenditures on behalf of candidates, however, it must report on a timelier basis—as soon as it spends more than $500 or within 48 hours of distributing an independent expenditure communication. *Id.* § 121.120(6)(j), .150(1). But if an executive committee were to make an expenditure relating to a ballot issue, the committee would be under no obligation to timely disclose it under current Kentucky law. *See* D. 28 (Defs.-Appellees' PI Br. at 10–11).

**B. Factual Background**

Appellants in this case are three county Republican Party executive committees—the Boone County Republican Party Executive Committee ("BCRP"), the Hardin County Republican Party Executive Committee ("HCRP"), and the Jessamine County Republican Party Executive Committee ("JCRP") (collectively "the executive committees"). R.1 (Pls.' Verified

Compl. For Decl. & Inj. Relief ("Ver. Compl.") ¶ 4) (Page ID #4).  (Page ID #4).  In official filings with the Registry, HCRP and JCRP state their purpose as "support[ing] or oppos[ing] KY candidates."          *JCRP*,          Registry,          https://perma.cc/EU2T-PD9U;          *HCRP*,          Registry, https://perma.cc/FBG7-VXS2.  BCRP states that its purpose is to be a "Political Party."  *BCRP*, Registry, https://perma.cc/7SLX-8H7X.

On or about June 10, 2024, HCRP and JCRP sought an advisory opinion from the Registry as to whether a county party executive committee may make expenditures supporting or opposing a state constitutional amendment on the ballot.  R. 14-3 (Exhibits to Defs.' Mem. of Law in Resp. to Pls.' Mot. For Prelim. Inj., Permanent Inj., & Mot. For Summ. J.) (Page ID #148–49).  In response to their requests, the Registry issued an advisory opinion.  R. 1-3 (Exhibit to Ver. Compl.) (Page ID #21–23).  In Advisory Opinion 2024-02, the Registry interpreted the regulatory definition of an executive committee, which authorizes such committees to "'raise[] and spend[] funds to promote political party nominees'" and to "'perform[] other activities commensurate with the day-to-day operation of a political party'" to foreclose "us[ing] the funds that it raises for party nominees to support a constitutional amendment."  *Id.* at 2–3 (Page ID #22–23) (quoting 32 Ky. Admin. Reg. 1:050).  The Registry opined that "[t]o the extent that members of the executive committee would like to begin raising funds to support or oppose a constitutional amendment, those members interested must form a political issues committee to do so."  *Id.* at 3 (Page ID #23).

After this advisory opinion issued, HCRP and JCRP retained counsel who, in a series of emails to the Registry, revealed more precisely how they sought to act.  R. 1-4 (Exhibit to Ver. Compl.) (Page ID #24–28).  The executive committees wished to print and distribute communications that simultaneously (1) advocate for the Republican slate of candidates, (2) advocate in favor of a constitutional amendment; and (3) provide voter education that a "straight ticket vote does not vote the amendment."  *Id.* at 2 (Page ID #25).  The executive committees believed that they would be foreclosed, under the Registry's opinion, from producing these communications because they included direct advocacy in favor of a constitutional amendment.

In the exchange with the Registry, the parties' counsel asked the Registry to withdraw its opinion and sought assurances that they would not be subject to enforcement for engaging in such communications. R. 1-4 (Exhibit to Ver. Compl.) (Page ID #24). Counsel for the Registry refused. *Id.* Lacking those assurances, HCRP and JCRP, along with BCRP (which was not involved in the advisory letter exchange), filed a verified complaint for declaratory and injunctive relief against members of the Registry and its executive director ("the Registry"). R. 1 (Ver. Compl.) (Page ID #1). In their verified complaint, the executive committees acknowledged that they had "expressly raised funds and solicited donors for donations, for the express purpose of purchasing signs, campaign materials (to include mailers and door-to-door door hangers) that advocate in favor of the Republican party candidates and nominees (both local and national), as well as the School Choice Amendment." *Id.* ¶ 16 (Page ID #6). The School Choice Amendment, known as Amendment 2, was a proposed state constitutional amendment that would have authorized the state legislature to "provide financial support for the education of students outside the system of common schools." *Id.* ¶ 2 (Page ID #3); *see* 2024 Ky. Acts 32 (H.B. 2). According to appellants, Amendment 2 was a "central issue for voters, particularly voters aligned with [the parties'] values." *Id.* ¶ 17 (Page ID #6). Thus, having "determined" that advocacy in favor of the amendment is likely to drive turnout in favor of Republican candidates, the executive committees designed mailers and door-to-door campaign printings that simultaneously advocated the Republican slate of candidates and the constitutional amendment. *Id.* ¶ 31 (Page ID #9).[1] As of the filing of the complaint, none of the executive committees had yet begun printing or distributing the communications, although the HCRP and BCRP intended to do so regardless of judicial intervention. *Id.* ¶ 36 (Page ID #10).

**C. Procedural Background**

Simultaneous with the filing of their verified complaint in the district court, the executive committees moved for a temporary restraining order, a preliminary injunction, a permanent injunction, and summary judgment. R. 6 (Pls.' Mot. For TRO, Prelim Inj., Permanent Inj., and Summ. J. ("PI Mot.")) (Page ID #65–84). The executive committees contend that the Registry

---

[1]The complaint asserted that BCRP also intended to expend funds in support of a separate amendment prohibiting non-citizens from voting in Kentucky elections. R. 1 (Ver. Compl. ¶ 18) (Page ID #6).

violates their First Amendment rights by prohibiting them from making expenditures in favor of a constitutional amendment. *Id.* at 16 (Page ID #80). The district court denied the TRO on the grounds that the executive committees were unlikely to face enforcement action within the duration of any TRO, but set an expedited briefing schedule on the other motions. R. 9 (TRO Mem. Op. & Order at 4) (Page ID #114); R. 13 (Scheduling Order) (Page ID #121). The Registry opposed the executive committees' motions, arguing that they lacked standing to bring a preenforcement challenge and that the Registry did not limit the executive committees' expenditures, but rather sought only to enforce valid disclosure requirements on independent expenditures by requiring the executive committees to form political issues committees in support of the amendment. R. 14 (Defs.' Mem. of Law in Supp. of Resp. to PI Mot. at 10–11) (Page ID #131–32).

The district court denied the motion for a preliminary injunction after a hearing. Although the district court found that the executive committees had standing to bring their preenforcement challenge, the court concluded that they were unlikely to succeed on the merits of their First Amendment claim. *Boone County Republican Party Exec. Comm. v. Wallace*, Civ. A. No. 3:24-49 (GVT), 2024 WL 3912946, at *3–7 (E.D. Ky. Aug. 22, 2024). The district court reasoned that requiring the executive committees to form political issues committees to expend money in favor of the constitutional amendment imposed at most a "minimal" burden on the executive committees' First Amendment rights, which was justified by the governmental interest in transparency and disclosure. *Id.* at *5–7. Hence, whether under the standards of strict scrutiny, "exacting" scrutiny, or rational-basis review, the Registry met its burden. *Id.* at *7.

The executive committees appealed the denial of the preliminary injunction and moved in the district court for an injunction pending appeal. R. 24 (Emergency Mot. for Inj. Pending Appeal) (Page ID #227–31). The district court denied the motion for an injunction pending appeal. R. 26 (D. Ct. Inj. Pending Appeal Mem. Op. & Order) (Page ID #285–94). The executive committees, with the support of the Kentucky Attorney General as amicus, then sought an injunction pending appeal pursuant to Federal Rule of Appellate Procedure 8(a)(2). We granted the injunction pending appeal. We held that the executive committees were likely to demonstrate standing to seek injunctive relief and that they were likely to succeed on the merits

of their First Amendment claim. *Boone Cnty. Republican Party Exec. Comm. v. Wallace*, 116 F.4th 586, 596, 598 (6th Cir. 2024). Construing the Registry's regulation of the executive committees' spending on ballot issues as a restriction on political expenditures, rather than a disclosure requirement, we concluded that the regulation was unlikely to satisfy strict scrutiny. *Id.* at 598–99. We then ordered expedited briefing on the preliminary-injunction appeal. *Id.* at 599.

Since the injunction pending appeal was granted, the election has passed, and Amendment 2 has failed. *See Official 2024 General Election Results*, Ky. State Bd. of Elections, https://perma.cc/QX77-ZF3D. The executive committees acknowledged at oral argument that, in the leadup to the election, they expended funds in favor of the constitutional amendments in reliance on this court's injunction pending appeal. Oral Arg. Hr'g at 30:42–31:10.[2] The preliminary-injunction appeal is now before us.[3]

## II. STANDARD OF REVIEW

To prevail on a preliminary injunction, the moving party must show that (1) it has a strong likelihood of succeeding on the merits; (2) it is likely to suffer irreparable harm without an injunction; (3) the balance of equities favors an injunction; and (4) the public interest favors an injunction. *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021). We review the district court's determination of the likelihood of success on the merits of the First Amendment claim de novo. *Id.* But we review the district court's assessment of the other three factors as well as its ultimate determination under the abuse-of-discretion standard. *Id.* In First Amendment cases, the outcome generally turns on whether the moving party has shown a likelihood of success on the merits of their First Amendment claim because the remaining "issues of the public interest and harm to the respective parties largely depend on the constitutionality of the [state action]." *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir.

---

[2]Audio of the oral argument hearing is available at https://perma.cc/L42N-PUKB.

[3]In addition to the parties' briefs and the record below, we have also considered the amicus brief filed by the Commonwealth of Kentucky in support of the executive committees. *See* D. 27 (Amicus Br. of Ky. in Supp. of Pls.-Appellants).

2012) (quoting *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007) (alteration in original)).

## III. JURISDICTION

Before we reach the merits of the First Amendment claim, we must consider whether the moving party has demonstrated a likelihood of success of establishing this court's jurisdiction. *Hargett*, 2 F.4th at 554. If the moving party cannot demonstrate a likelihood of jurisdiction, the preliminary-injunction motion must be denied. *Id.* Here, the Registry raises two jurisdictional challenges: standing and ripeness.

## A. Standing

To establish Article III standing, a plaintiff must show an injury-in-fact caused by the complained of conduct that would be redressable by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). An injury-in-fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (citation omitted). An allegation of future injury might suffice when the threatened injury is "*certainly* impending" or there is a "substantial risk" that harm will occur. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013). Accordingly, when an arrest, prosecution, or other enforcement action is sufficiently imminent, the injury-in-fact element is satisfied. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). "[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Id.* (quoting *Steffel v. Thompson,* 415 U.S. 452, 459 (1974)).

We assess whether a plaintiff has Article III standing at the outset of the litigation. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000); *Kentucky v. Yellen*, 54 F.4th 325, 336 (6th Cir. 2022) ("Whether a party has standing to redress an injury is measured as of the time the injury is first asserted."). At this stage, the executive committees can establish the requisite injury to bring a preenforcement challenge by demonstrating a likelihood that, at the time the complaint was filed, (1) they intended to engage in expression protected by the Free Speech and Association Clauses; (2) their expression was arguably proscribed by the challenged statutes, regulations, opinions, and actions of the Registry;

and (3) they faced a credible threat of enforcement for exercising their constitutional rights. *See Driehaus*, 573 U.S. at 159.

The executive committees have sufficiently demonstrated that they intended to engage in protected speech. Specifically, in their verified complaint, the executive committees declared that they intended to, and took steps in furtherance of, printing and distributing communications advocating in favor of Amendment 2. R. 1 (Ver. Compl. ¶¶ 15–18, 24–25, 31) (Page ID #5–7, 9). Further supporting their initial stated intentions, counsel for the executive committees admitted at oral argument that the executive committees in fact expended funds and distributed communications in favor of Amendment 2 in advance of the election, after this court issued an injunction pending appeal. Oral Arg. Hr'g at 30:42–31:10

The executive committees have also demonstrated that their speech is arguably proscribed by the challenged statutes, regulations, opinions, and the actions of the Registry. Speech is arguably proscribed by a statute or regulation that "could . . . be construed" to prohibit plaintiffs' intended speech. *Yellen*, 54 F.4th at 337. Two of the executive committees—HCRP and JCRP—sought an advisory opinion from the Registry as to whether they could expend funds in support of a state constitutional amendment. R. 14-3 (Exhibits to Defs.' Mem. of Law in Resp. to PI Mot.) (Page ID #148–49). The Registry addressed the central question still at issue—whether executive committees may expend funds in support of a proposed constitutional amendment without registering as a political issues committee. The Registry said that they could not and has not disclaimed that position. R. 1-3 (Exhibit to Ver. Compl.) (Page ID #21–23). Accordingly, the executive committees have demonstrated that the conduct in which they intended to engage—expending funds advocating in favor of both Republican candidates and a state constitutional amendment without registering as a political issues committee—is arguably proscribed by Kentucky law.

Although the question is closer, at least one of the executive committees showed that its speech was chilled by a credible threat of enforcement at the outset of the litigation. To demonstrate a credible threat of enforcement, "the first and most important factor is whether the challenged action chills speech." *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022). The speech of the JCRP was chilled because, "fearing enforcement action," it alleged that it would

not expend funds in favor of the amendment "without injunctive relief." R. 1 (Ver. Compl. ¶ 36) (Page ID #10).[4] That JCRP ultimately engaged in the protected speech after we issued an injunction pending appeal does not undermine the conclusion that, at the time the lawsuit was filed, JCRP's speech was chilled by the possibility of enforcement.

When determining whether a petitioner faces a credible threat of enforcement, we have commonly considered four factors: (1) Have the defendants previously enforced the challenged provision against the plaintiffs or others? (2) Have the defendants sent warning letters to the plaintiffs? (3) Do aspects of the regulatory regime make enforcement easier or more likely, such as a provision allowing citizens to file complaints? and (4) Have the defendants refused to disavow enforcement of the challenged provision against the plaintiffs? *Online Merchants Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021).

The first factor weighs against the executive committees. They have not supplied any evidence that the challenged restriction has previously been enforced against the plaintiffs or others. The executive committees' generalized contention that the Registry "actively enforces" the state's campaign-finance laws, R. 1 (Ver. Compl. ¶ 7) (Page ID #4), offers little support for the argument that the Registry will enforce here.

We have emphasized, however, that the four factors are "not exhaustive, nor must each be established" as long as "'some combination' of the factors are present." *Online Merchants Guild*, 995 F.3d at 550 (quoting *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016)). And here, the remaining factors suggested a credible threat of enforcement in the future. To begin, the Registry has issued an advisory opinion indicating that the precise conduct in which the executive committees sought to engage—expending funds on campaign materials supporting the constitutional amendment—is contrary to Kentucky's laws and regulations. Further, the nature of the challenged regulatory regime makes regulatory investigation and enforcement easier and more likely. Under Kentucky law, members of the public can file a complaint with the Registry,

---

[4]The speech of HCRP and BCRP might not have been chilled because they "intend[ed] to make the expenditures in question in favor of the constitutional amendments" regardless of judicial relief. R. 1 (Ver. Compl. ¶ 36) (Page ID #10); *see* D. 6 (Pls.-Appellants' Emergency Mot. for Inj. Pending Appeal at 11) (referencing only the chill to JCRP's speech). But because "only one plaintiff needs to have standing in order for the suit to move forward," it suffices that JCRP's speech has been chilled. *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 710 (6th Cir. 2015).

which the executive committees claimed was likely.  Ky. Rev. Stat. § 121.140(1); *see* R. 1 (Ver. Compl. ¶ 31) (Page ID #9).  The allowance of complaints from members of the public creates a "real risk of complaints from, for example, political opponents" with an intent to frustrate speech they oppose.  *Driehaus*, 573 U.S. at 164.  Such complaints could trigger burdensome investigations and administrative or criminal proceedings against the executive committees in the heat of an election cycle.  *See id.* at 165–66; *Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014).  Lastly, the Registry has refused to disavow enforcement of the challenged restrictions.  In an email to appellants' counsel, counsel for the Registry declined to "say that the Registry would ignore a properly filed complaint nor [would counsel] guarantee how the Board would vote to handle the matter if it was presented to them."  R. 1-4 (Exhibit to Ver. Compl.) (Page ID #24).  Nor has the Registry disavowed its position in briefing.

The Registry takes issue with the second factor:  whether defendants have issued a warning letter.  *See* D. 28 (Defs.-Appellees' PI Br. at 19–23).  The Registry argues that the advisory opinion is not a warning letter for two reasons.  First, the Registry contends that the advisory opinion was not the official opinion of the agency, because it was issued only by the general counsel and not by the Board pursuant to a formal enforcement proceeding.  *Id.* at 19–20.  The opinion is not a threat of enforcement, the Registry contends, but at most a defense to enforcement.  *Id.* at 20.  Second, the Registry argues that the advisory opinion is not even applicable as a defense to enforcement because HCRP and JCRP omitted material facts about the nature of their intended activity when they made the request for an advisory opinion.  *Id.* at 20–21.  Specifically, when requesting the advisory opinion, the executive committees did not disclose that they intended to produce and circulate materials advocating for both candidates and issues, or materials advising voters about straight-ticket voting.  *Id.* at 21.

This argument elevates form over substance.  As noted earlier, the advisory opinion addresses the central issue of whether the executive committees may spend money supporting or opposing a ballot issue without forming a political issues committee.  Although the Registry seeks to disclaim the aptness of that opinion to the facts at hand, its statements in the leadup to and during this litigation suggest that the opinion remains on point.  When counsel for the executive committees sought clarity on the application of this opinion to joint expenditures,

counsel for the Registry doubled down, saying that such expenditures would be "dancing . . . close to a violation of the law." R. 1-4 (Exhibit to Ver. Compl. at 1) (Page ID #24). In the hearing on the preliminary injunction before the district court, counsel for the Registry further explained that the executive committees were not allowed to produce and distribute communications advocating for both candidates and issues without registering as a political issues committee and making joint expenditures. R. 25 (PI Hr'g Tr. at 15–17) (Page ID #247–49). And in briefing before this court, the Registry has continued to suggest that it views such communications as impermissible. *See* D. 28 (Defs.-Appellees' PI Br. at 8–11). Whatever the legal significance of the advisory opinion in state administrative proceedings, we think that it squarely reflects the Registry's opinion on the law.

The continued insistence on the illegality of the executive committees' activity supports the credible threat of enforcement when viewed in tandem with the system of enforcement. Here, the general counsel for the agency has announced that it views the executive committees' conduct as illegal, inviting politically motivated members of the public to file complaints and seek enforcement against them. Viewing the factors holistically, we conclude that the lack of a specific warning letter does not wash away the credible threat of enforcement here. Accordingly, the executive committees are likely to demonstrate standing to raise their First Amendment claim.

## B. Ripeness

The Registry next contends that the dispute here is not yet ripe for review. Historically, ripeness has had constitutional and prudential components. The doctrine of constitutional ripeness, like standing, derives from the Article III requirement that federal courts review only actual cases or controversies. *Miller v. City of Wickliffe*, 852 F.3d 497, 506 (6th Cir. 2017). "The doctrine dictates that courts should decide only existing, substantial controversies, not hypothetical questions or possibilities." *City Commc'ns, Inc. v. City of Detroit*, 888 F.2d 1081, 1089 (6th Cir. 1989). "[W]hen a case is anchored in future events that may not occur as anticipated, or at all," the case is not ripe for review. *Id.*

In preenforcement First Amendment challenges, constitutional ripeness and constitutional standing coincide. *Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016). "Whether the plaintiffs have standing and whether their claims are ripe come to the same question: Have they established a credible threat of enforcement?" *Id.*; *see Driehaus*, 573 U.S. at 157 n.5 (recognizing that standing and ripeness "boil[ed] down to the same question" in a constitutional preenforcement challenge). To the extent that the Registry challenges constitutional ripeness, we must reject the argument, for the executive committees have demonstrated a credible threat of enforcement.

The prudential-ripeness doctrine, by contrast, tests the hardship to the parties if judicial relief is withheld and the fitness of the issues for judicial review. *Carman v. Yellen*, 112 F.4th 386, 401 (6th Cir. 2024). The Supreme Court has called the doctrine "into question in recent years," *id.* at 400, in recognition of the doctrine's tension with the "principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging," *Driehaus*, 573 U.S. at 167 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S 118, 126 (2014)). Despite this uncertainty, we have "continued applying the doctrine[,] particularly when important future intervening events, such as impending regulatory action, will clarify the dispute or obviate the need for weighing in on contingencies." *Carman*, 112 F.4th at 400.

The Registry argues that the challenge here is not ripe because the Registry's Board has not reached a final decision about the legality of the executive committees' joint ballot- and candidate-related communications. D. 28 (Defs.-Appellees' PI Br. at 27–28). We do not think that the failure to issue a final interpretive decision renders the challenge prudentially unripe. Although the Registry insists there is a possibility that the Board will change its mind, the Registry's statements and briefing hardly suggest any probability of this result.[5] *See Carman*, 112 F.4th at 403.

---

[5]In its amicus brief, the Kentucky Attorney General argues that the Registry has misinterpreted state law. *See* D. 27 (Amicus Br. of Ky. in Supp. of Pls.-Appellants at 7–9). However, the Registry has suggested no affinity for this position.

The Registry relies principally on a Second Circuit case applying the prudential-ripeness doctrine to a statutory and constitutional challenge to an advisory opinion issued by the Federal Election Commission. *U.S. Def. Comm. v. Fed. Election Comm'n*, 861 F.2d 765, 772 (2d Cir. 1988). In concluding that the challenge was not ripe, the Second Circuit reasoned that the advisory opinion was not final because the Commission could change its position in enforcement proceedings, that judicial review was available once a final decision was rendered, and that the Commission was presently engaged in rulemaking that "could alter the very regulations applied in [the advisory] opinion." *Id.* at 771–72. Even setting aside our reservations about the continued application of the prudential-standing doctrine, *U.S. Defense Committee* is distinguishable. In that case, the Commission issued three different advisory opinions and was presently engaged in a rulemaking that was likely to affect the outcome of plaintiffs' case. *See id.* at 767–70, 772. Amid such uncertainty, we are not surprised that the Second Circuit deemed the issues not yet fit for judicial resolution.[6] Here, however, the Registry's restrictions on the executive committees are likely ripe for review.

## IV.  LIKELIHOOD OF SUCCESS ON THE MERITS

Having dispatched with these jurisdictional challenges, we proceed to the likelihood of success on the merits of the First Amendment challenge. We conclude that the executive committees are not likely to prevail on their constitutional claim because, at this stage in the litigation, the executive committees have not demonstrated that the Registry banned their speech. Rather, it appears to us that the Registry has imposed a disclosure requirement that satisfies exacting scrutiny.

---

[6]Passage of the election has not rendered the challenge moot either. *See Brown v. Yost*, 122 F.4th 597, 601 (6th Cir. Nov. 21, 2024) (en banc) (per curiam). Although the motion for a preliminary injunction was trained on plaintiffs' ability to speak on issues relating to the November 2024 election, the executive committees retain a stake in the preliminary-injunction appeal because they face potential liability for expending funds and engaging in speech concerning Amendment 2 in the leadup to that election, and they have expressed a continuing desire to weigh in on future issues. Because they could still be subject to enforcement for those past actions and to speech prohibitions on future issues, the motion for the preliminary injunction and appeal thereof is not moot. *See Fischer v. Thomas*, 78 F.4th 864, 867–68 (6th Cir. 2023).

## A.  Rights of Executive Committees

In the realm of First Amendment rights, few are more central than the right to express opinions on electoral questions and the qualifications of political candidates.  *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010); *Citizens Against Rent Control/Coalition for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 298 (1981).  The right to express opinions on such issues inheres in individuals, as well as in corporations and other associations, including political parties and committees formed to speak on a ballot issue.  *Citizens United*, 558 U.S. at 342, 346–47; *Colo. Republican Fed. Campaign Comm. v. Fed. Election Comm'n*, 518 U.S. 604, 615–16 (1996) (plurality opinion); *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 222 (1989); *Citizens Against Rent Control*, 454 U.S. at 299.

The Registry argues that no speaker's First Amendment rights are burdened here because the "executive committee" is just a "reporting unit" of the political party, not the political party itself.  *See* D. 28 (Defs.-Appellees' PI Br. at 32–34).  The Registry notes that the term "executive committee" is defined in Kentucky's campaign-finance statute alongside seven other types of committees, including political issues committees, which are characterized by the identity of their members and the extent to which each can accept contributions and expend funds related to issues or candidates.  Ky. Rev. Stat. § 121.015(3).  The Registry contends that it is "not uncommon" for political parties to maintain separate committees and accounts based on the source of the contributions and the purpose of their expenditures.  D. 28 (Defs.-Appellees' PI Br. at 34).

We decline to adopt such a narrow view of the executive committees' rights.  The executive committees are at least associations of individuals, who solicit and pool contributions from the public and expend those funds in service of their shared views.  This type of association is unquestionably "entitle[d] to First Amendment protection."  *Fed. Election Comm'n v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480, 494 (1985) (recognizing that political action committees have expressive rights); *see Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 430 n.27 (5th Cir. 2014) ("[T]he Supreme Court has regularly reminded the lower courts that organizations such as political committees and corporations have First Amendment rights to engage in political speech.").

In any event, we think the Registry has overstated the distinction between the executive committees and the parties. As an initial matter, the Registry previously characterized county party executive committees as acting "as the functional units of the Republican party at the county level." D. 17 (Defs.-Appellees' Resp. to Mot. for Inj. Pending Appeal at 4); *accord* R. 14 (Defs.' Mem. of L. in Supp. of Resp. to Pls.' Mot. for Prelim. Inj. at 3) (Page ID #124). And the executive committees have assured us this is so: at oral argument, counsel for the executive committees contended that the county party executive committee and the county political party are actually "coextensive." Oral Arg. Hr'g at 10:20; *see id.* at 10:30 ("[A]s a practical matter, [the executive committee] *is* the Boone County affiliate of the Republican Party"). Counsel asserted that all money raised by the county parties is reported under the umbrella of the executive committees, and all disclosure reports are similarly made by the executive committees, for activities including fundraisers, dinners, and candidate outreach. *Id.* at 10:01–32.

This view draws support from the regulation on which the Registry elsewhere relies. That regulation describes an executive committee as "an organizational unit or affiliate recognized within the document governing a political party," whose tasks include "the day-to-day operation of a political party." 32 Ky. Admin. Reg. 1:050, § 1(1). Further, the Official Rules of the Republican Party of Kentucky, of which we may take judicial notice, provide that whenever a County Committee elects an executive committee, and gives notice thereof to the state Republican Party, "it shall thereafter function in place of the County Committee until a new County Committee takes office." *Rule 4.08, Official Rules of the Republican Party of Kentucky (ratified Jan. 6, 2024)*, Republican Party of Ky., https://perma.cc/Q6XZ-PMRY.

Although the Registry may view executive committees primarily as reporting units, it appears to us, based on the limited record before us, that they are more fairly construed as the governing bodies of the county republican parties. And prohibiting the governing body of a political party from raising and expending money concerning a state constitutional amendment is tantamount to prohibiting the party from doing the same. *Eu*, 489 U.S. at 222–23 (recognizing that law restricting speech of governing bodies of political party restricted the speech of the political party). "The independent expression of a political party's views is 'core' First

Amendment activity no less than is the independent expression of individuals, candidates, or other political committees." *Colo. Republican Fed. Campaign Comm.*, 518 U.S. at 616.

## B. Speech Restriction vs. Disclosure Regime

We next turn to whether the limitations set out here by the Registry burden speech protected by the First Amendment. The central question, on which our views have evolved since we issued the injunction pending appeal in this case, is whether the requirement that an executive committee register as a political issues committee to expend funds supporting or opposing a constitutional amendment is a ban on the executive committee's speech or a campaign finance disclosure requirement.[7] How we resolve this question determines the level of scrutiny that applies.

The key distinction between a ban on speech and a disclosure requirement is that, whereas "disclosure requirements may burden the ability to speak, [] they impose no ceiling on campaign-related activities and do not prevent anyone from speaking." *Citizens United*, 558 U.S. at 366 (citations omitted). "To determine whether a rule is a disclosure requirement, or something more, we look to see the effect of the provision. Disclosure and disclaimer rules require the provision of information, and only incidentally prevent speech when the speaker is unwilling to provide the additional required information." *Catholic Leadership Coal. of Tex.*, 764 F.3d at 426; *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 507 (D.C. Cir. 2016) (disclosure rules "require the speaker to provide more information to the audience than he otherwise would"). "By contrast, provisions that put a ceiling on speech even if a party is willing to provide all of the information that the government requests constitutes something more than a simple disclosure requirement." *Catholic Leadership Coal. of Tex.*, 764 F.3d at 426–27.

---

[7]In our opinion on the injunction pending appeal, we stated that we were "not aware of, and the Registry ha[d] not pointed us to, any cases construing any similar restriction as simply a matter of disclosure." *Boone Cnty. Republican Party Exec. Comm.*, 116 F.4th at 598. Neither party (nor amicus) raised the substantial and unanimous body of persuasive authority from our sibling circuits construing similar requirements as disclosure regimes and rejecting the precise arguments raised by the executive committees. We expect that the parties would have disclosed these cases from the outset. Particularly in the emergency posture of an injunction pending appeal, we rely on the parties to inform us of relevant authorities—favorable and adverse—to aid in our decision.

Upon further reflection, briefing, and oral argument in this case, we are now persuaded that requiring the executive committees to register as political issues committees to speak on ballot questions is a disclosure requirement and not a ban on speech. The requirement does not put any "ceiling" on the executive committee's expenditures, nor does it "prevent anyone from speaking." *Citizens United*, 558 U.S. at 366 (citations omitted). To the contrary, once the political issues committee is registered, the executive committee may accept unlimited contributions, including from corporations, and make unlimited expenditures to support or oppose the contested issue.

Consider what is required here. When an executive committee collects more than $1,000 to support or oppose a ballot initiative, it must register as a political issues committee for that election, notify the public of what it plans to support or oppose, and indicate whether it plans to raise more than $5,000. Ky. Rev. Stat. §§ 121.170(1), 121.180(1)(a)(1). It may retain its name and structure—the political issues committee can be called the Boone County Republican Party and share a chairperson and treasurer with the executive committee.[8] *See* R. 25 (PI Hr'g Tr. at 39–40) (Page ID #271–72). Beyond that, the political issues committee must open a separate bank account separating political-issues related funds from funds collected for the purpose of supporting candidates.[9] Ky. Rev. Stat. § 121.170(1). Finally, the political issues committee must make reports on a timely basis leading up to an election and thereafter. *Id.* § 121.180(3)(b), (4).

Courts uniformly recognize that provisions requiring entities to register a political committee, maintain an organizational structure for the committee, employ a treasurer, keep detailed records, and file reports listing contributors and expenditures fall within the ambit of disclosure requirements. *See Buckley v. Valeo*, 424 U.S. 1, 62–64 (1976) (characterizing a federal statute that imposed reporting obligations on political committees, defined as groups of

---

[8]Indeed, we take judicial notice of the fact that political advocacy groups in Kentucky frequently register year after year as political issues committees, using the exact names they use elsewhere. For example, Americans for Prosperity – Kentucky, Planned Parenthood Action Kentucky, and the People's Campaign routinely register as political issues committees and independent expenditure-only committees concerning different elections. *See Issues Committees*, Registry, https://perma.cc/57CM-6XHG.

[9]This makes good sense, considering that under Kentucky law, corporations can contribute to issues committees but cannot contribute to an executive committee. Ky. Rev. Stat. § 121.150(18).

persons receiving contributions and making expenditures over $1,000 each year, as "disclosure requirements [that] impose no ceiling on campaign-related activities"); *Nat'l Org. of Marriage v. McKee*, 649 F.3d 34 (1st Cir. 2011); *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 137 (2d Cir. 2014); *The Real Truth About Abortion, Inc. v. Fed. Election Comm'n*, 681 F.3d 544, 548–49 (4th Cir. 2012); *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 480 (7th Cir. 2012); *Missourians for Fiscal Accountability v. Klahr*, 892 F.3d 944, 949–50 (8th Cir. 2018); *Human Life of Wash. v. Brumsickle*, 624 F.3d 990, 997, 1002–06 (9th Cir. 2010); *Coal. for Secular Gov't v. Williams*, 815 F.3d 1267, 1270, 1275 (10th Cir. 2016); *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1244 (11th Cir. 2013); *SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686, 696–97 (D.C. Cir. 2010). That makes sense: registration and organizational requirements facilitate the recordkeeping needed to ensure that disclosure of information is timely and accurate.

The executive committees argue that the above-described regime is a ban on their speech because the executive committee, qua executive committee, may not raise and spend money supporting or opposing a ballot issue. D. 26 (Pls.-Appellants' Br. at 28–30). In support of this argument, the executive committees rely principally, as we did in our injunction-pending-appeal decision, on *Citizens United*. In *Citizens United*, the Supreme Court held that corporations have speech rights, and, accordingly, a ban on corporate campaign spending violated the First Amendment. *Citizens United*, 558 U.S. at 365. Because corporations were banned from spending money, *id.* at 337 ("The law before us is an outright ban, backed by criminal sanctions."), it was no answer that a separate association, "a [political action committee ("PAC")] created by a corporation [could] still speak," *id.* Upon further reflection, we now recognize that this case is not analogous for multiple reasons.

First, *Citizens United* concerned a prohibition on corporate expenditures for political speech. *Citizens United*, 558 U.S. at 321. In *Citizens United*, corporations were prohibited from spending profits earned through their ordinary business to participate in elections. The law directly foreclosed them from spending their own money to advocate for or against their preferred candidates. *See id.*; 2 U.S.C. § 441b(b)(2) (2002). There is no similar restriction here. Executive committees collect money to further political goals. Here, the executive committees

are not prohibited from contributing to a political issues committee funds that they collected for the purpose of supporting or opposing the issue.  The Registry has repeatedly stated that the executive committee could transfer funds collected in support of the proposed state constitutional amendment to the account of a political issues committee registered to support that amendment. R. 25 (PI Hr'g Tr. at 7) (Page ID #239); D. 28 (Def.-Appellees' PI Br. at 43) ("[N]othing keeps the committees from transferring funds they improperly collected for spending on Amendment 2 to a [political issues committee].").  What the Registry has prohibited is the expenditure of funds "raise[d] *for party nominees* to support a constitutional amendment."  R. 1-3 (Exhibit to Ver. Compl. at 23) (Page ID #23) (emphasis added).  Nothing in the  Constitution requires the Registry to allow the executive committees to spend money supporting a proposed state constitutional amendment when that money was collected to support party nominees.

Second, the corporate PACs at issue in *Citizens United* were distinct entities from the corporation and were "limited to donations from stockholders and employees of the corporation."  *Citizens United*, 558 U.S. at 321; *see also The Real Truth About Abortion, Inc.*, 681 F.3d at 549 (distinguishing these PACs because they "were subject to several limitations on allowable contributions").  Here, the Kentucky statute does not require the establishment of any similarly distinct entity.  When the executive committee wants to raise and spend money in support of a political issue, it can simply register as a political issues committee.  The political issues committee can share the same name and membership composition as the executive committee.  According to the Registry, the political issues committee could be called the "Hardin County Republicans" or "Hardin County Republicans Support Amendment 2."  *See* R. 25 (PI Hr'g Tr. at 39) (Page ID #271).  The committees could have "overlap[ping] officers" and "overlapping membership."  *Id.* at 40 (Page ID #272).  Unlike the political action committees in *Citizens United*, the executive committee and the political issues committee can be functionally identical.  Further, the political issues committee can receive money that was raised by the executive committee to support a ballot issue, and it can even collect money from *more* sources than it could if it were operating as an executive committee.

Third, the requirements of forming a political issues committee are less onerous as applied to the executive committees, as compared to the requirements in *Citizens United*.

Whereas in *Citizens United* the corporations lacked the organizational structure and mechanics to engage in campaign disclosure, *see Citizens United*, 558 U.S. at 338–39; *McConnell v. Fed. Election Comm'n*, 530 U.S. 93, 330–32 (2003) (Kennedy, J., concurring in part and dissenting in part), the executive committees here are already set up in the same form as the political issues committee and can hardly complain of a lack of expertise in this realm.

The dissenting opinion position reads *Citizens United* too broadly. It understands *Citizens United* to rest on the formal distinction between the corporation and the PAC through which it could ostensibly speak. Dissenting Op. at 36. That cannot be right. If it were, then every law requiring registration as a political committee would be unconstitutional, because the committee will always be a formally separate entity from the group, organization, or individual that formed it. We do not believe that the Supreme Court *sub silentio* declared unconstitutional all political-committee registration regimes, the predominant form of campaign-finance disclosure on the state and federal levels. *See Buckley v. Valeo*, 424 U.S. at 62–68 (upholding PAC requirements); *cf. McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 194 (2014) (plurality opinion) (reviewing limits on contribution to political committees). The dissenting opinion offers no limiting principle that would avoid this absurd result. In distinguishing *Citizens United*, we do not suggest that the speech of political organizations has any less value than the speech of corporations or other natural persons, as the dissent misleadingly suggests. Dissenting Op. at 36. For the reasons explained above, the relationship between corporations and the PACs at issue in *Citizens United* is meaningfully different from the relationship between the executive committees and the political issues committees here. The dissenting opinion's failure to acknowledge any of these differences shows how reductive its position is. The dissenting opinion relies only on the formal differences between a political issues committee and the executive committee that forms it. *Citizens United* rested less on the formal differences between a corporation and a PAC, and more on the actual, tangible differences between those organizations. Our prior opinion on the injunction pending appeal failed to appreciate fully those distinctions.

The determination whether a state is requiring disclosure or banning speech turns on the "effect of the provision." *Catholic Leadership Coal. of Tex.*, 764 F.3d at 426. "It is not the

designation as a [political committee] but rather the obligations that attend [political committee] designation that matter for purposes of First Amendment review." *Nat'l Org. for Marriage*, 649 F.3d at 56. The effect of the Registry's regulation here is to "require the provision of information"; speech is only "incidentally prevent[ed]" insofar as the executive committees are unwilling to comply with the political issues committee requirements. *See Catholic Leadership Coal. of Tex.*, 764 F.3d at 426. The dissenting opinion misconstrues the record by suggesting that the Registry threatened enforcement if the executive committees issued a flyer jointly advocating for its preferred candidates and issues. Dissenting Op. at 33–34. The Registry has indicated that the executive committees could likely issue the exact communications they wished to issue—supporting both Amendment 2 and their preferred slate of candidates—through the mechanism of a joint expenditure between the executive committee and its political issues committee. *See* D. 25 (PI Hr'g Tr. at 16–17) (Page ID #248–49). The executive committee would simply need to register a political issues committee first, thereby disclosing its funding and intent to support the ballot issue.

Decisions from our sibling circuits strongly support this position. These courts have unanimously held that requiring a group of individuals or a preexisting organization to register as a political committee, with its attendant organizational and reporting requirements, does not ban the speech of the preexisting group or organization, but simply imposes a requirement to disclose. *See, e.g.*, *Worley*, 717 F.3d at 1243–45 (group of individuals); *The Real Truth About Abortion*, 681 F.3d at 548–49 (nonprofit corporation); *Vt. Right to Life Comm.*, 758 F.3d at 137 (nonprofit corporation and political committee); *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 871 n.5 (8th Cir. 2012) (en banc) (corporations). *Citizens United* does not hold otherwise. *See Worley*, 717 F.3d at 1243–44; *The Real Truth About Abortion*, 681 F.3d at 549; *see also Nat'l Org. for Marriage*, 649 F.3d at 55; *Stop This Insanity Inc. Employee Leadership Fund v. Fed. Election Comm'n*, 761 F.3d 10, 13–14 (D.C. Cir. 2014). The dissenting opinion offers no serious reason to distinguish these cases. It argues that they "analyze entirely different state campaign-finance regulatory schemes." Dissenting Op. at 37. But that is not why we cite them here. These cases addressed, as we have, the extent to which *Citizens United* limits a state's ability to require individuals, associations, and entities to register as political

committees before engaging in political fundraising and speech. These courts rejected the expansive reading that the dissenting opinion urges.

The executive committees seek to distinguish the authority from our sibling circuits on the basis that those cases did not involve—"as this case does—a restriction on the content of speech by a committee already registered, and that already reports contributors and expenditures, with the state." D. 29 (Pls.-Appellants' PI Reply at 20) (contending that this case "challenges the ability of the state to prohibit the content of political speech by already registered committees"). This argument proves too much. It suggests that any committee, once registered, must be allowed to expend funds on any candidate or issue; that if a committee registers to support candidate Jane Doe, then it must also be able to spend money on Issue 2. This position would call into question not only Kentucky's entire taxonomy of committees, Ky. Rev. Stat. § 121.015(3), but also a host of similar regimes in other states, *see, e.g.*, Mich. Comp. Laws §§ 169.202(4), 169.211(3), (6); 10 Ill. Comp. Stat. 5/9-1.8; *see generally Ballot Measure Disclosure Requirements*, Nat'l Council of State Legis., https://www.ncsl.org/elections-and-campaigns/ballot-measure-disclosure-requirements. Such a striking position is not warranted.

The executive committees, the dissenting opinion, and the Commonwealth of Kentucky as amicus, also suggest that the present case is *sui generis* because it involves political parties. They contend that political parties must be able to expend funds in support of ballot initiatives because ballot initiatives are interrelated with support for party candidates, and that advocating on a political issue is a useful way of driving turnout for their preferred candidates. *See* D. 29 (Pls.-Appellants' PI Reply at 16); D. 27 (Ky. PI Amicus Br. at 9). We recognize that political parties have a significant interest in endorsing candidates, *Eu*, 489 U.S. at 224, and also have an interest in identifying the issues that the political party supports. But requiring the executive committees to register as political issues committees for the purpose of an election regarding proposed state constitutional amendments does nothing to stop this. The Registry has not prohibited the executive committee from stating whether it supports or opposes any constitutional amendment. *Cf. id.* at 224–25 (holding that a law prohibiting a political party from endorsing candidates "burden[ed the party's] rights to free speech and free association"). And, to the extent that it wants to back up that position with funds, the party's executive committee

may register a political issues committee to do so. In so concluding, we do not "misunderstand[]" the First Amendment by concluding that protected political speech does not include the right to spend funds in support of political views." Dissenting Op. at 35. The executive committees can still spend money advocating for and against ballot initiatives; they simply must register as a political issues committee first.

The executive committees finally argue that *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986), supports their position. In that case, the Court analyzed a federal law requiring corporations to establish a "political committee" before making independent expenditures on behalf of candidates. *Mass. Citizens for Life*, 479 U.S. at 253. A majority of the Court concluded that heightened regulatory requirements associated with establishing a more formalized organization burdened the non-profit organization's First Amendment activities. *Id.* at 254–56 (plurality opinion), 265–66 (O'Connor, J., concurring).[10] *Massachusetts Citizens for Life* is distinguishable from the Kentucky Registry case, however. First, as in *Citizens United*, the alternative route of forming a political committee in *Massachusetts Citizens for Life* was seriously limiting compared with the option here. The political committee form in *Massachusetts Citizens for Life* was restricted to soliciting contributions from members, which "vastly reduce[d] the source of funding for organizations with few or no formal members." *Id.* at 255. No such restrictions on the solicitation of funds by a political issues committee apply here; indeed, political issues committees may solicit *unlimited* funds, including from corporate donors, unlike executive committees that cannot take corporate contributions or contributions greater than $5,000. Ky. Rev. Stat. § 121.150(11), (18). Second, the burden upon the executive committees here is unlikely to "discourage protected speech" of executive committees, which already have the organizational structure and expertise to operate under campaign finance regulations, compared with the unsophisticated organizations at issue in *Massachusetts Citizens for Life*, that would "need to assume a more sophisticated organizational

---

[10]Four members of the Court joined in an opinion that located the constitutional burden in both the heightened organizational requirements as well as the additional disclosure requirements. *See Mass. Citizens for Life*, 479 U.S. at 254–56 (plurality opinion). Justice O'Connor filed a concurring opinion on the narrower ground that the "significant burden" arose "not from the disclosure requirements that [the organization] must satisfy, but from the additional organizational restraints imposed upon it by the" challenged statute. *Id.* at 266 (O'Connor, J., concurring).

form, to adopt specific accounting procedures, [and] to file periodic detailed reports." *Mass. Citizens for Life*, 479 U.S. at 255. Third, that case concerned an apparently arbitrary distinction between incorporated versus unincorporated entities. *Id.* at 252–53. The executive committees here are being treated no differently from any other group of "three (3) or more persons joining together to advocate or oppose a constitutional amendment or public question which appears on the ballot if that committee receives or expends money in excess of one thousand dollars ($1,000)." Ky. Rev. Stat. § 121.015(3)(d).

In reaching these conclusions, we emphasize what this case does *not* involve. The Registry has not limited speech beyond the executive committees' "willing[ness] to register, report information, keep necessary records, and take organizational steps." *Missourians for Fiscal Accountability*, 892 F.3d at 950. The Registry has not imposed, for example, waiting periods on groups seeking to speak in an election. *Compare id.* (rule requiring committee to be formed at least 30 days before an election); *Catholic Leadership Coal. of Tex.*, 764 F.3d at 427 (rule prohibiting committee from expending funds until 60 days after registration). Nor has the Registry limited what a committee may say as part of its message. *Compare Pursuing Am.'s Greatness*, 831 F.3d at 508 (rule prohibiting unauthorized political committee from using candidate's name in the title of its webpages). Finally, the Registry has not imposed registration requirements that are so *onerous* as applied to the plaintiffs that they might be characterized as a ban on speech. *Compare Minn. Citizens Concerned for Life, Inc.*, 692 F.3d at 875 (rule requiring ongoing reporting after a group made a $100 aggregate expenditure).

Nor does this case involve content- and speaker-based discrimination. The executive committees and the dissenting opinion also argue that strict scrutiny applies because the Registry's position that an executive committee may expend funds on candidates, but not on ballot questions, is a content- and speaker-based restriction on speech. D. 26 (Pls.-Appellants' PI Br. at 19–25). The executive committees contend that the restriction is content based because their speech is banned based on the "topic discussed or idea or message expressed." *Id.* at 20. Specifically, the Registry has taken the position that an executive committee may print flyers encouraging citizens to vote for a candidate because they support Amendment 2, but cannot print flyers directly endorsing Amendment 2. *Id.* at 21–22. The executive committees and the

dissenting opinion then contend that the restriction is speaker based because executive committees of political parties are prohibited from making expenditures in favor of a constitutional amendment, but an individual or a political issues committee is not. *Id.* at 23. Neither of these challenges gets off the ground because, as we have explained, the Registry has not banned the executive committees' speech once they register as political issues committees.

Ultimately, the position that the executive committees and dissenting opinion ask us to adopt has no meaningful stopping point short of concluding that all committee-based disclosure schemes violate the Constitution. If it violates the First Amendment to require that a political party executive committee form a separate political issues committee through which to speak on a ballot issue, the same would apply to individuals, nonprofits, corporations, and other groups seeking to do so. *Citizens United* does not require such a sweeping result. In sum, we join our sibling circuits in concluding that a requirement to register a political issues committee is a disclosure requirement, not a ban on speech.

## C.  Application of Exacting Scrutiny to the Disclosure Regime

Because we have concluded that the Registry imposes a disclosure requirement, we apply exacting scrutiny rather than strict scrutiny. *Buckley v. Valeo*, 424 U.S. at 64. Exacting scrutiny requires a substantial relation between the disclosure requirement and a sufficiently important government interest, and that the disclosure requirement be narrowly tailored to the interest it promotes. *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2385 (2021); *see also Citizens United*, 558 U.S. at 366. "While exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest." *Bonta*, 141 S. Ct. at 2383. "We . . . require a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Id.* at 2384 (quoting *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 218 (2014) (plurality opinion)).

The Registry contends that its disclosure requirement is justified by a sufficiently important interest in transparency and ensuring that the public is informed about who is supporting and opposing ballot initiatives, so that they can "make informed election choices."

*See* D. 28 (Defs.-Appellees' Br. at 39–41, 44).  The executive committees do not contest that this is a sufficiently important interest to justify a disclosure requirement.  Nor could they:  beginning in *Buckley v. Valeo*, the Supreme Court recognized that disclosure vindicates an interest in providing the electorate with information about who supports a candidate for office and how they spend money; this permits voters better to evaluate the candidate and the interests they might support.  *Buckley v. Valeo*, 424 U.S. at 66–67; *see also Citizens United*, 558 U.S. at 367.  Similar considerations apply forcefully in the context of ballot initiatives.

In direct democracy, voters are "responsible for taking positions on some of the day's most contentious and technical issues" amid an onslaught of communications from individuals and interest groups seeking to influence their decisions.  *Human Life*, 624 F.3d at 1006. "[A]verage citizens are subjected to advertising blitzes of distortion and half-truths and are left to figure out for themselves which interest groups pose the greatest threats to their self-interest." *Id.* (quoting David S. Broder, *Democracy Derailed: Initiative Campaigns and the Power of Money* 18 (2000)).  In these high-stakes contests, just as in candidate elections, voters have an unmistakable interest in knowing who is backing the messages coming their way.  *Id.*

Disclosure laws bear a substantial relation to the public's informational interest in a ballot-initiative campaign.  *Ctr. for Indiv. Freedom*, 697 F.3d at 480.  Because ballot committees frequently carry misleading names, disclosure laws are critical in exposing who is spending money to support or oppose an initiative.  *Id.* at 480–81; *see Citizens Against Rent Control*, 454 U.S. at 298 (noting that, in ballot-measure campaigns, "when individuals or corporations speak through committees, they often adopt seductive names that tend to conceal the true identity of the source").  Identifying the interest groups backing a particular issue offers a powerful cue about who stands to win or lose as a result of the proposed legislation or constitutional amendment. Michael S. Kang, *Democratizing Direct Democracy: Restoring Voter Competence Through Heuristic Cues and "Disclosure Plus,"* 50 UCLA L. Rev. 1141, 1157–59 (2003).

The Supreme Court has indicated its approval of state disclosure laws relating to ballot initiatives, even if it has not passed on them directly.  When striking down limitations on contributions and expenditures for ballot initiative campaigns, the Court has pointed to disclosure laws to achieve the ends of "mak[ing] known the identity of supporters and opponents

of ballot measures." *Citizens Against Rent Control*, 454 U.S. at 298–99 (concluding that the city's interest in limiting contributions was "insubstantial" because voters could obtain the identities of supporters through disclosure lists published before an election); *see First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 792 n.32 (1978) (suggesting that disclosure requirements remedy concerns about excessive corporate spending in referenda elections). And when the Court held unconstitutional a Colorado law requiring disclosure of the names of paid petition circulators, it took comfort in the remaining disclosure requirements identifying who had contributed funds to the campaign. *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 203 (1999). "[D]isclosure is a less restrictive alternative to more comprehensive regulations of speech." *Citizens United*, 558 U.S. at 369.

The values of disclosure are not costless, however, principally because disclosure requirements can burden associational rights. "[P]ublic disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute." *Buckley v. Valeo*, 424 U.S. at 68. And there is a risk that "disclosure of [a committee's] contributors' names 'will subject them to threats, harassment, or reprisals from either Government officials or private parties.'" *Citizens United*, 558 U.S. at 367 (citation omitted).

The executive committees do not claim that disclosing contributions or expenditures will in any way discourage people from donating or subject their donors to any harassment. Indeed, their proposed alternative is a requirement that the executive committee "report more frequently." D. 26 (Pls.-Appellants' Br. at 41). Instead, they claim that "a complete prohibition on spending in favor of constitutional amendments" is not narrowly tailored to the Registry's interests in maintaining an informed citizenry. *Id.* Yet, as we have explained, the registration requirements do not operate as a ban on the executive committees' speech.

Some courts have also held that a committee-disclosure regime is unconstitutionally burdensome when applied to individuals or small organizations, for whom the registration and reporting requirements are sufficiently burdensome to discourage the group from engaging in political speech. *See Coal. for Secular Gov't*, 815 F.3d at 1278 ("[A]ny reporting burdens must be measured against the government's interest in that disclosure."); *see also Minn. Citizens Concerned for Life, Inc.*, 692 F.3d at 873, 876–77. The registration and reporting scheme here is

not so onerous as applied to the executive committees as to give us pause. Although the executive committees characterize the various reporting requirements associated with political issues committee registration as burdensome, *see* D. 26 (Pls.-Appellants' Br. at 31–35), they have made no showing that any one of these requirements would be burdensome enough to deter their political speech. As we have explained, the executive committees already comply with the same reporting requirements except that they need not report in the leadup to the election. True, the Registry's aims might be achieved through some less burdensome means, such as by imposing a disclosure requirement on executive committees that raise and expend funds in support of an election, without first requiring the registration of a political issues committee. After all, the Registry already orders executive committees to make disclosures within 48 hours of an independent expenditure on behalf of a candidate. Ky. Rev. Stat. § 121.120(6)(j). However, *Bonta* does not require the least-restrictive means. *Bonta*, 141 S. Ct. at 2383–84. And we can appreciate how registration of a political issues committee with a publicly disclosed purpose, bank account, and responsible organizational structure would serve the state's purpose of obtaining full and timely disclosure. Accordingly, the executive committees are not likely to prevail on the merits of this claim.

## V.  PRELIMINARY INJUNCTION FACTORS

Having concluded that the executive committees are not likely to succeed on the merits of their First Amendment claim, we briefly turn to the remaining preliminary injunction factors. We review the district court's assessment of those factors under the abuse-of-discretion standard. *Hargett*, 2 F.4th at 554. As in many First Amendment cases, the likelihood of success on the merits has a determinative effect. *Bays*, 668 F.3d at 819. Accordingly, once the district court concluded that the executive committees were unlikely to succeed on the merits of their First Amendment claim, the district court did not abuse its discretion by holding that the executive committees were unlikely to face irreparable First Amendment injury, or that the public interest in "timely disclosures" outweighed the alleged harms to the executive committees. *Boone Cnty. Republican Exec. Comm.*, 2024 WL 3912946, at *7–8.

Even apart from the merits, we doubt that the executive committees continue to meet the "indispensable" requirement of irreparable harm now that the November 2024 election has

passed. *Fischer v. Thomas*, 78 F.4th 864, 868 (6th Cir. 2023) (citation omitted). We considered a similar situation in *Fischer*, which concerned a First Amendment challenge to limitations on the speech of judicial candidates. In that case, like this one, we granted an injunction pending appeal, but did not reach the merits of the preliminary-injunction appeal until the candidates' election passed. *Id.* at 867. After the election, we held that the judicial candidates no longer faced irreparable injury because they had not identified a future electoral campaign in which their speech would be chilled. *Id.* at 868. Rather, they faced only the prospect of enforcement during the pendency of the federal litigation, harm that could be remedied by damages if the court found that their past speech was protected by the First Amendment. *Id.* at 869.

Here, the executive committees have expressed a general intention to "continue to make expenditures in future election cycles on issues and issues-related campaigns, including on constitutional amendments, tax proposals, and the like, anytime such issues have an intersection with the Republican Party's platform." R. 1 (Compl. ¶ 37) (Page ID #10). But they have not identified any pending election or ballot question on which they seek to advocate while the litigation is ongoing in the district court. Accordingly, we are doubtful that the executive committees can demonstrate the requisite likelihood of irreparable harm in any event.

## VI. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of the motion for a preliminary injunction and **VACATE** the injunction pending appeal.

———————————

**DISSENT**

———————————

GRIFFIN, Circuit Judge, dissenting.

Contrary to the First Amendment, Supreme Court precedent, and our prior opinion enjoining the district court's order pending appeal, *Boone County Republican Party Executive Committee v. Wallace*, 116 F.4th 586 (6th Cir. 2024), my colleagues hold that the Republican Party executive committees of Boone, Hardin, and Jessamine Counties, Kentucky, are prohibited from speaking on proposed state constitutional amendments because, under Kentucky law, they must create a different and separate entity—a so-called "political issues committee"—to speak in support of their political views. But political speech is the highest valued and most protected form of speech in the United States. *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 660–61 (6th Cir. 2007). Our country prides itself on our liberal free-speech regime, which was born out of the founders' desire to engage in unfettered political speech. Today, political speech is at the forefront of our everyday lives, and our jurisprudence has protected individuals', organizations', and businesses' right to engage in such speech time and time again. *See, e.g.*, *Republican Party of Minn. v. White*, 536 U.S. 765, 788 (2002); *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 216 (1989); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 319 (2010). Nevertheless, the majority allows the Kentucky Registry of Election Finance to unconstitutionally suppress pure political speech. I respectfully dissent in this important First Amendment case.

I.

As explained in our prior opinion, upon the request of two plaintiffs here, the Kentucky Registry of Election Finance issued an "advisory opinion" explaining that political parties' executive committees (which are responsible for the parties' day-to-day operations and raising money to promote their nominees) may not spend funds to support or oppose proposed state constitutional amendments. *See Boone Cnty.*, 116 F.4th at 591–92. Do not be fooled by the nomenclature of an "advisory" opinion. The requester of the advisory opinion is expected to

follow it, *see* Ky. Rev. Stat. § 121.135(4)(a), and if an individual or organization files a complaint against the requester for allegedly violating the opinion, the Registry has said that it cannot "ignore a properly filed complaint."

To that end, the Registry refused to assure plaintiffs that it would not take enforcement action against them if their executive committees spent funds on this mailer that advocated both for Republican candidates and proposed amendments to Kentucky's constitution:



According to the Registry, if the county Republican executive committees wished to spend money advocating for these state constitutional amendments, they would have to form an entirely new entity—a political issues committee. *See Boone Cnty.*, 116 F.4th at 592.

## II.

## A.

With their First Amendment rights threatened, plaintiffs turned to the courts. After the district court denied plaintiffs' motion for a preliminary injunction, our panel unanimously held that plaintiffs were likely to succeed on the merits of their First Amendment claims and thus granted their motion for an injunction pending appeal, effectively permitting plaintiffs to send the mailers and spend funds on the constitutional referenda. In our prior opinion, we correctly reasoned:

> In the realm of First Amendment rights, few are more central than the right to express opinions on electoral questions and the qualifications of political candidates. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339, 130 S. Ct 876, 175 L.Ed.2d 753 (2010); *Citizens Against Rent Control/Coalition for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 298, 102 S. Ct. 434, 70 L.Ed.2d 492 (1981). The right to express opinions on such issues is not limited to individuals but inheres also in corporations and other associations. *Citizens United*, 558 U.S. 342, 346–47, 130 S. Ct. 876 (affording First Amendment protection to corporate expression); *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 222 109 S. Ct. 1013, 103 L.Ed.2d 271 (1989) (same as to political parties); *Citizens Against Rent Control*, 454 U.S. at 299, 102 S. Ct. 434 (same as to committees formed to speak on a ballot issue). Accordingly, it is likely that the executive committees have a right to express themselves on topics related to the election, including advocacy for or against a constitutional amendment.

> * * *

> The Registry seeks to minimize this burden by pointing out that the same members of the executive committees could express their views in another way. *See* Opp'n at 16–17. Namely, they could form—and perhaps have definitionally already formed— a political issues committee, which could raise and expend money in support of the amendment. *See id.* But the availability of an alternative means for members of the executive committees to speak freely does not mitigate the burden placed on the executive committees. The Court rejected a nearly identical argument in *Citizens United*. In that case, the Court reviewed the Federal Election Commission's ban on corporate campaign advocacy in the run-up to an election. 558 U.S. at 337, 130 S. Ct. 876. The Court rejected the

argument that a corporation's ability to form and advocate through a federal political action committee ("PAC") nonetheless enabled it to speak. *Id*. Hence, under *Citizens United*, allowing the members of the executive committees to form political issues committees does "not allow [the executive committees] to speak" but rather restricts their speech on the topic of a state constitutional amendment. *Id.*

*Id*. at 596–97.

Our analysis of this issue was consistent with *Citizens United v. Federal Election Commission*, wherein the Supreme Court held: "The Government may regulate corporate political speech through disclaimer and disclosure requirements, but it may not suppress that speech altogether." 558 U.S. at 319. Prior to *Citizens United*, federal law required corporations to form political action committees, or "PACs," to spend funds on electioneering communications. *Id*. at 321. But that "amorphous regulat[ion]" banned corporations' political speech by forcing them to create an entirely new entity to engage in such speech. *Id*. at 324, 337. As a clear speaker-based restriction on corporate political speech, the Supreme Court declared the obvious: "We find no basis for the proposition that, in the context of political speech, the Government may impose restrictions on certain disfavored speakers." *Id*. at 341.

Unfortunately, and contrary to *Citizens United*, my colleagues have now backtracked, sanctioning the Registry's trammeling of plaintiffs' First Amendment rights by construing the Registry's action as "a disclosure requirement and not a ban on speech." They conclude:

> The Registry has not prohibited the executive committee from stating whether it supports or opposes any constitutional amendment. *Cf.* [*Eu*, 489 U.S.] at 224–25 (holding that a law prohibiting a political party from endorsing candidates "burden[ed the party's] rights to free speech and free association"). And, to the extent it wants to back up that position with funds, the party's executive committee may register a political issues committee to do so.

This reasoning fundamentally misunderstands the First Amendment by concluding that protected political speech does not include the right to spend funds in support of political views. *See Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 302–03 (2022) (explaining that campaign expenditures constitute protected political speech under the First Amendment). To be sure, "[t]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United*, 558 U.S. at 339 (citation omitted). The majority's opinion—

which precludes speech advocating for political candidates and issues—cannot be squared with our expansive protection of political speech. *See id.* at 329.

Moreover, the majority holds that Kentucky can prohibit political organizations from speaking so long as they may form a separate entity to advance their views. That holding too is contrary to *Citizens United*, which concerned 2 U.S.C. § 441b's "ban on corporate speech notwithstanding the fact that a PAC created by a corporation can still speak." *Id.* at 337. And in finding that provision unconstitutional, the Court emphasized that a "PAC is a separate association from the corporation" and thus "the PAC exemption from § 441b's expenditure ban . . . does not allow corporations to speak." *Id.* Stated differently, a PAC is a wholly distinct entity and its ability to speak for itself cannot justify muting a corporation's desire to express that same speech. The same reasoning applies equally here—just as a PAC is a separate association from a corporation, a political issues committee is a separate association from a political party's county organizations.

The majority contends that *Citizens United* does not control because that case involved speech by a corporation, while this case concerns speech by political organizations, implying that the First Amendment protects corporations more than it protects political organizations. This proposition is truly astounding and, again, contrary to the First Amendment principles articulated by the Supreme Court:

> The identity of the speaker is not decisive in determining whether speech is protected. Corporations and other associations, like individuals, contribute to the discussion, debate, and the dissemination of information and ideas that the First Amendment seeks to foster. The Court has thus rejected the argument that the political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not natural persons.

*Id*. at 342–43 (internal citations and quotation marks omitted). Indeed, the majority ignores that, "[i]n the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784–85 (1978).

The majority believes that decisions from our sister circuits are on point, while *Citizens United* is distinguishable.  To the detriment of the First Amendment, my colleagues have it backwards.  Our sister circuits' cases are inapposite to the present case because they analyze entirely different state campaign-finance regulatory schemes, while *Citizens United*—which set the standard for whether government regulation of political expenditures unconstitutionally suppresses protected speech—is on point and controlling precedent.  *See, e.g.*, *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 137 (2d Cir. 2014) (holding that Vermont's PAC disclosure requirements and definition of "political committee" are constitutional); *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 877 (8th Cir. 2012) (holding Minnesota's PAC reporting requirements constitutional); *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1002–06 (9th Cir. 2010) (upholding Washington's spending regulations of "political committees" as disclosure requirements under exacting scrutiny); *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1242–53 (11th Cir. 2013) (holding Florida's political committee ad-disclosure requirements constitutional under exacting-scrutiny analysis).

To reiterate: "The Government may regulate corporate political speech through disclaimer and disclosure requirements, but it may not suppress that speech altogether"; "corporations and other associations, like individuals," are entitled to this First Amendment protection.  *Citizens United*, 558 U.S. at 319, 343.  As it did at the injunction-pending-appeal stage, *Citizens United* dictates our decision in this case.  I therefore disagree with the majority's departure from that binding Supreme Court precedent.

B.

Moreover, let us not lose track of the speech at issue here.  The Registry's advisory opinion precludes political executive committees from spending their funds—and, in turn distributing mailers—in support of proposed constitutional amendments.  This prohibition is an unconstitutional content- and speaker-based restriction of political speech.

Start with content based.  Content-based restrictions "treat[] speech differently based on the viewpoint or subject matter of the speech, on the words the speech contains, or on the facts it conveys." *Planet Aid v. City of St. Johns*, 782 F.3d 318, 326 (6th Cir. 2015) (citation omitted).

A law may be content based even if it is viewpoint neutral. *Id.* The majority misunderstands the effect of Kentucky's advisory opinion and accompanying campaign-finance regime when it concludes that these rules constitute a disclosure requirement and not a content-based prohibition of speech. Although the restriction is viewpoint neutral—it forbids advocacy both for and against an amendment—First Amendment protections extend equally to "prohibition[s] of public discussion of an entire topic." *Id.* (quoting *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 537 (1980)); *see also White*, 536 U.S. at 774 (holding that a prohibition on candidates for state judgeships from announcing their views on political issues is a content-based restriction). As plaintiffs aptly put it, a mailer that says "please vote for our candidates" is permitted, while a mailer that says "please vote for our constitutional amendment" is not. This is a quintessential content-based restriction.

And it is equally clear that the Registry is implementing an unlawful speaker-based restriction. "Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United*, 558 U.S. at 340. The executive committees here must form an entirely new entity to advocate for the proposed referenda. In other words, Kentucky campaign-finance law allows certain speakers (political issues committees) to raise and spend funds supporting a constitutional amendment, but it prohibits other speakers (executive committees) from doing the same. This is a quintessential speech-based restriction. *See id.* ("Speech restrictions based on the identity of the speaker are all too often simply a means to control content.").

Whether one views the advisory opinion as a content-based restriction, speaker-based restriction, or both, it is subject to strict scrutiny. *See Boone Cnty.*, 116 F.4th at 597. And as we previously held, the regulation here likely fails to survive such scrutiny. *See id.* at 596–99. The district court therefore should have enjoined the Registry's enforcement of the advisory opinion against plaintiffs, allowed them to spend funds on the mailers, and relieved them from potential prosecution for violations of Kentucky campaign-finance law.

C.

In his amicus brief for the Commonwealth of Kentucky, Kentucky's Attorney General opposes, on First Amendment grounds, the Registry's attempt to prohibit speech by county political parties on political issues.  He notes that political issues and candidates are inextricably intertwined from the perspective of political parties and voters and states, the "advocacy by a local political party may well move the needle in a constitutional referendum in a way that advocacy by a newly constituted political-issues committee cannot."  I agree.

The Registry's argument that local political parties do not typically advocate on political issues ignores reality.  "[T]he basic nature of the party system" is that "party members join together to further common political beliefs, and citizens can choose to support a party because they share some, most, or all of those beliefs."  *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 226 (2014) (plurality opinion).  From their founding (e.g., the Republican Party's opposition to slavery) to the present (e.g., the Green Party's promotion of eco-social issues), political parties advocate and seek to implement a collection of political issues, expressed in their party platform.  And as one former Speaker of the United States House of Representatives put it, "all politics is local."  Tip O'Neill, All Politics is Local: And Other Rules of the Game (Adams Media Corp., 1995).  Divorcing a local political party from its political issues destroys a fundamental function of a political party.

III.

Because Kentucky has dictated and limited the speakers who may speak on proposed state constitutional amendments, I respectfully dissent.  I would reverse the district court's denial of plaintiffs' motion for a preliminary injunction.[1]  After applying strict scrutiny to this content- and speaker-based restriction, I would hold that the district court abused its discretion because plaintiffs have established a strong likelihood of success on the merits of their First Amendment

---

[1]I agree with the majority that plaintiffs have standing.  And although the 2024 election has passed, this case is not moot because plaintiffs could face disciplinary action related to their 2024 election campaign conduct at any time.  *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 20 (2020) (holding that a case is not moot when there remains a "constant threat" of governmental action).  Moreover, this campaign issue is likely to recur yet evade review before elections conclude.  *See Memphis A. Randolph Inst. v. Hargett*, 2 F.4th 548, 559–60 (6th Cir. 2021).

claims.    Therefore, I would allow plaintiffs to engage in their constitutionally protected and desired political speech.