888 F.2d 1111
 64 A.F.T.R.2d 89-5830, 90-1 USTC P 50,095
 WILLIAM G. WILCOX, D.O., P.C. EMPLOYEES' DEFINED BENEFIT
PENSION TRUST; and William G. Wilcox, D.O., P.C.,
Plaintiffs and Counterclaim
Defendants-Appellants (88-1008),
v.
UNITED STATES of America, Defendant and Counterclaim
Plaintiff-Appellee,
v.
RUBENSTEIN, ISAACS, BORDMAN & LAX CORPORATION, Counterclaim Defendant,
Lowell R. Stuckman, Intervenor-Appellant (88-2194).
 Nos. 88-1008, 88-2194.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 4, 1989
Decided Nov. 3, 1989.
 
 Alan C. Applebaum (argued), Reifman & Applebaum, Kevin T. Keena and Erwin A. Rubenstein, Rubenstein, Issacs, Lax & Bordman, Southfield, Mich., William G. Wilcox, D.O. P.C. Employee's Defined Benefit Pension Trust and William G. Wilcox, D.O. P.C., plaintiff-appellant, and Rubenstein, Isaacs, Lax & Bordman, Corp., third-party appellee.
 Gary R. Allen, Acting Chief, U.S. Dept. of Justice, Tax Div., Anne B. Durney, U.S. Department of Justice, Tax Div. Appellate Section, Murray S. Horwitz (argued), Dept. of Justice, Tax Div., Washington, D.C., Charles Stroad, Dist. Counsel, I.R.S., Detroit, Mich., Fred Goldberg, Chief Counsel, I.R.S., Todd Luwoma, U.S. Dept. of Justice, Tax Div., Washington, D.C., Frank Poma, Manager, I.R.S. Pontiac, Mich., for the U.S.
 Peter J. Kelley (argued) Kathryn L. Duhamel, Ann Arbor, Mich., for Lowell R. Stuckman, intervenor-appellant.
 Before KRUPANSKY and RYAN, Circuit Judges, and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This is a consolidated appeal of William G. Wilcox (Wilcox),[1] in appeal number 88-1008, who has appealed from the district court's grant of summary judgment in favor of defendant-appellee, Internal Revenue Service (IRS), permitting the IRS to seize the assets of Wilcox, his medical corporation, and pension trust to satisfy his delinquent tax liabilities which had accrued during the years of 1981 and 1982, and Lowell Stuckman (Stuckman), in appeal number 88-2194, who has appealed the district court's denial of his motion to intervene in appeal number 88-1008 as a party in interest arising from his ownership of a 1935 Auburn automobile which Stuckman had in his possession at the time of the IRS' seizure of Wilcox's property.
 
 
 2
 Wilcox is a physician licensed to practice osteopathic medicine in the State of Michigan. In 1977, Wilcox incorporated his medical practice, under the laws of Michigan, as William G. Wilcox, D.O., P.C. (the corporation). Wilcox was the sole shareholder, officer, director and employee of the corporation. The corporation employed independent contractors to perform all services not performed by Wilcox.
 
 
 3
 On June 30, 1981, the corporation created a pension trust, Employee's Defined Benefit Pension Trust (pension trust) which qualified as a tax-exempt retirement plan under the Internal Revenue Code. Wilcox was the sole trustee and beneficiary of the pension trust.
 
 
 4
 A 1986 Lincoln Continental was titled to the corporation and the following vehicles were titled to the pension trust:
 
 1) 1977 Ferrari
 2) 1937 Packard
 3) 1910 Maxwell
 4) 1981 Chevrolet pick-up truck
 
 5
 Wilcox testified that he has used the 1986 Lincoln Continental, from time to time, for personal purposes and transportation.
 
 
 6
 In March of 1984, Wilcox belatedly filed his individual federal income tax returns for the 1981 and 1982 tax years. On May 14, 1984, the IRS assessed taxes, penalties, and interest of $244,960.62 against Wilcox for his failure to pay 1981 federal income taxes. Wilcox paid $153,235.79 of this amount, leaving an unpaid balance of $91,724.83. On June 25, 1984, the IRS assessed $177,530.84 against Wilcox as 1982 income taxes, interest and penalties. Wilcox paid $116,958.41, leaving an unpaid balance of $60,572.97.
 
 
 7
 On February 24, 1986, after failing to receive further payments from Wilcox on the outstanding balances of his tax liabilities, the IRS filed notices of federal tax liens with the Register of Deeds for Oakland County, Michigan, pursuant to 26 U.S.C. Sec. 6321, against the assets of the pension trust and the corporation as alter egos of Wilcox. On February 26, 1986, the IRS seized the 1981 Chevrolet pick-up truck, which was titled to the pension trust, in an attempt to collect Wilcox's delinquent tax liabilities. On March 10, 1986, the IRS notified Wilcox of its intent to sell the pick-up truck at an auction on March 25, 1986.
 
 
 8
 On March 21, 1986, Wilcox, the corporation and the pension trust filed suit, pursuant to 26 U.S.C. Sec. 7426, in the United States District Court for the Eastern District of Michigan, seeking, inter alia, a temporary restraining order and a preliminary injunction against the IRS to prevent the sale of the 1981 Chevrolet pick-up truck seized by the IRS. Wilcox, the corporation and the pension trust also sought compensatory damages for alleged injuries sustained as a result of the IRS' actions.
 
 
 9
 On June 5, 1986, the IRS filed an answer and counterclaim against Wilcox, the corporation, the pension trust, and the law firm of Rubenstein, Isaacs, Bordman and Lax Corp., which had claimed an interest in the 1981 Chevrolet pick-up truck.[2] The IRS counterclaim sought to foreclose the federal tax liens against the assets of Wilcox, the corporation and the pension trust, alleging that they were his alter egos.
 
 
 10
 The matter was referred to a magistrate who conducted an evidentiary hearing in October, 1986. On August 14, 1987, the magistrate issued a report and recommendation concluding that Wilcox's request for a preliminary injunction should be denied because he had failed to demonstrate that irreparable harm would result from the sale of the 1981 pick-up truck; the truck was neither unique nor was it necessary for the care and maintenance of the other pension trust assets as claimed by Wilcox. The magistrate further concluded that Wilcox was unlikely to succeed on the merits because it appeared that Wilcox was the alter ego of the corporate entities. "[T]he line between [Wilcox] and the corporate entit[ies] [was] sufficiently vague to permit the corporate veil to be pierced." On November 2, 1987, the district court adopted the magistrate's report and recommendation and accordingly denied Wilcox's motion for a preliminary injunction.
 
 
 11
 On November 9, 1987, the IRS filed a motion for summary judgment to foreclose on the assets of the corporation and pension trust in order to satisfy Wilcox's outstanding tax liabilities. On December 10, 1987, the district court granted the IRS' motion for summary judgment concluding that the magistrate's recommendation denying the appellant's motion for a preliminary injunction, as adopted by the district court, was dispositive of the summary judgment motion, because it was the "law of the case." The district court accordingly granted the government's motion to foreclose on the property of the corporation and the pension trust and ordered Wilcox to deliver the foreclosed property to the United States Marshal's Service for sale to satisfy his outstanding tax liabilities and the interest that had accrued thereon. It also dismissed Wilcox's complaint with prejudice.
 
 
 12
 On appeal, Wilcox has charged that, by applying the decision disposing of his motion for preliminary injunctive relief as the law of the case to the substantive issue joined by the government's motion for summary judgment, the district court committed reversible error. He has argued that there is a distinction between the burden of proof to support the denial of a preliminary injunction and the burden of proof necessary to support a summary judgment motion addressing the substantive issues joined by the pleadings. United States v. U.S. Smelting Ref. & Mining Co., 339 U.S. 186, 70 S.Ct. 537, 94 L.Ed. 750 (1950); Cale v. Johnson, 861 F.2d 943, 947 (6th Cir.1988). "Unlike the more precise requirements of res judicata, law of the case is an amorphous concept." Cale, 861 F.2d at 947 (quoting Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983)). "Rulings that simply deny extraordinary relief for want of a clear and strong showing on the merits, or that are avowedly preliminary or tentative, do not trigger law of the case consequences." 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure, Sec. 4478 at 798 (1981); accord Berrigan v. Sigler, 499 F.2d 514, 518 (D.C.Cir.1974).
 
 
 13
 "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." Id., at 395, 101 S.Ct. at 1834. "A party thus is not required to prove his case in full at a preliminary-injunction hearing ..., and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits...." Id., at 395, 101 S.Ct. at 1834; accord In re DeLorean Motor Co., 755 F.2d 1223, 1230 (6th Cir.1985).
 
 
 14
 Because of the lesser burden of proof required to support a motion for preliminary injunction as contrasted with a motion for summary judgment, a trial court's disposition of the substantive issues joined on a motion for extraordinary relief is not dispositive of those substantive issues on the merits. "As a general rule, decisions on preliminary injunctions do not constitute law of the case and 'parties are free to litigate the merits.' " Golden State Transit Corp. v. City of Los Angeles, 754 F.2d 830, 832 n. 3 (9th Cir.1985) (quoting City of Anaheim v. Duncan, 658 F.2d 1326, 1328 n. 2 (9th Cir.1981)), rev'd on other grounds, 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986). "Refusal to stay a preliminary injunction pending appeal does not establish the law of the case since it rests on nothing more than a tentative appraisal of the probable result on the merits." Bd. of Trade v. Commodity Futures Trading Comm'n, 605 F.2d 1016, 1020 (7th Cir.1979), cert. denied, 446 U.S. 928, 100 S.Ct. 1866, 64 L.Ed.2d 281 (1980). The district court's conclusion in the denial of the preliminary junction, in the case at bar, only demonstrated that Wilcox was unlikely to succeed on the merits. Technical Publishing Co. v. Lebhar-Friedman, Inc., 729 F.2d 1136, 1139 (7th Cir.1984) ("A factual finding made in connection with a preliminary injunction is not binding" on a motion for summary judgment.); City of Angoon v. Hodel, 803 F.2d 1016, 1024 n. 4 (9th Cir.1986) (determinations corresponding to a preliminary injunction do not constitute the law of the case), cert. denied, 484 U.S. 870, 108 S.Ct. 197, 98 L.Ed.2d 148 (1987); Sierra Club v. U.S. Army Corps. of Engineers, 771 F.2d 409, 413 (8th Cir.1985) (same); Berrigan, 499 F.2d at 518 ("The decision of a trial ... court to grant or deny a preliminary injunction does not constitute the law of the case for the purposes of further proceedings and does not limit or preclude the parties from litigating the merits...."); Marathon Petrol. Co. v. Lo Bosco, 623 F.Supp. 129, 131 (N.D.Ill.1985) (same); cf. Kirshner v. Uniden Corp. of America, 842 F.2d 1074, 1078 (9th Cir.1988). Accordingly, since the district court erroneously applied the "law of the case" doctrine in disposing of the summary judgment motion in favor of the IRS, the decision of the district court is REVERSED and REMANDED for further proceedings not inconsistent with this decision.[3]
 
 
 15
 The court's attention is next directed to the appeal of Lowell R. Stuckman (Stuckman) in appeal number 88-2194. On August 11, 1988, Stuckman filed a motion to intervene in the action against Wilcox, his corporation and pension trust pending in the United States District Court for the Eastern District of Michigan, asserting ownership of the 1935 Auburn automobile which was seized by the IRS, pursuant to the trial court's order of December 10, 1987, in satisfaction of Wilcox's outstanding tax liabilities. Michigan title certification of the 1935 Auburn was always in the possession and control of Stuckman. During the pendency of this litigation, it had been determined that although Stuckman had never transferred the title to the vehicle, Wilcox had obtained a New York certificate of title for the vehicle which he had fraudulently recorded in Michigan on June 25, 1985. The government conceded that the Wilcox title was fraudulently acquired and recorded and accordingly invalid.
 
 
 16
 Stuckman had been an avid classic automobile collector and, between 1971 and 1980, purchased and restored a number of antique automobiles. One of the vehicles in Stuckman's collection was the 1935 Auburn here in controversy. On August 11, 1980, Stuckman had sold a 1977 Ferrari to Wilcox for $85,000 pursuant to an agreement whereby Wilcox was to immediately pay Stuckman $20,000, with an additional payment of $25,000 to be made on September 5, 1980 and the balance of $40,000 to be evidenced by a promissory note bearing 12% interest to be amortized by equal monthly installments of $2,000 until the obligation was fully satisfied. Stuckman transferred the title of the Ferrari to Wilcox, upon the latter's execution and delivery of the note together with his initial payments required by their agreement, and Wilcox thereafter commenced his monthly payments.
 
 
 17
 On November 16, 1980, Stuckman and Wilcox discussed the sale of Stuckman's 1935 Auburn. During the telephone conversation, the two tentatively decided that Stuckman would sell the Auburn to Wilcox for $45,000. Wilcox was to pay $5,000 plus a previously incurred cost of $250 paid by Stuckman to transport the vehicle to Henry Seitz's (Seitz) facility for restoration "within the next few weeks," with the balance of $40,000 to be consolidated with the balance remaining due and owing on the Ferrari. The total consolidated indebtedness was to be evidenced by a single promissory note in the aggregate amount of $77,109.
 
 
 18
 Stuckman reduced the understanding of the parties to writing in a letter to Wilcox dated November 19, 1980, wherein Stuckman outlined the conditions of the agreement, which provided that Wilcox was to pay the initial down payment on the 1935 Auburn within "the next few weeks" and was to execute two enclosed promissory notes, the first of which evidenced the $5,250 down payment due on the Auburn, and the second in the amount of $77,109 which evidenced the aggregate remaining unpaid balances of $40,000 due on the Auburn as consolidated with the $37,109 on the Ferrari, which notes were to accrue interest at the rate of 14.2% per annum. The letter of agreement further provided for the cancellation of the original note evidencing Wilcox's indebtedness on the Ferrari. The letter concluded by stating that "[i]f I've forgotten anything or misunderstood anything please advise." Wilcox never acknowledged the letter of agreement, never paid the down payment of $5,250 on the 1935 Auburn and never executed the new promissory notes in the amount of $5,250 and $77,109, respectively, as required by the understanding between the parties. Stuckman also conditioned the sale by stating that "I will send you clear title to your 1935 Auburn Speedster" upon receipt of the executed notes. During the period between November 16, 1980, the date of the initial telephone conversation between Wilcox and Stuckman concerning the sale of the 1935 Auburn, and December 9, 1987, when Stuckman removed the vehicle, the 1935 Auburn was in Seitz's shop where it had been delivered by Stuckman for restoration.
 
 
 19
 Because Wilcox had failed to acknowledge the letter of agreement dated November 19, 1980, had failed to advance the initial down payment of $5,250 on the Auburn, and had failed to execute the notes, Stuckman never transferred the certificate of title of the 1935 Auburn to Wilcox. During the period here in controversy, Wilcox continued to make monthly payments which, according to Stuckman, were applied against the outstanding unpaid balance due on the Ferrari and were to be applied to the 1935 Auburn upon full satisfaction of the priority Ferrari indebtedness. Between 1981 and 1987, Wilcox made total principal and interest payments of $81,000 to Stuckman.
 
 
 20
 Seitz testified that he had completed the restoration of the Auburn in 1985 and Wilcox, during that period, had paid him between $30,000 and $40,000 for his services.
 
 
 21
 Because Wilcox had failed to make any payments to Stuckman after June 30, 1987, Stuckman removed the 1935 Auburn from the Seitz facility on December 9, 1987 and placed it in storage in the old Packard Building in Detroit. On June 6, 1988, the IRS seized the Auburn pursuant to the district court's December 10, 1987 order.
 
 
 22
 The IRS informed Stuckman on July 31, 1988 that it intended to sell the 1935 Auburn at auction on August 12, 1988. On August 11, 1988, Stuckman filed a motion to intervene in the pending district court case asserting ownership of the 1935 Auburn.
 
 
 23
 After conducting a hearing, the district court denied Stuckman's motion to intervene and refused to enjoin the auction of the vehicle concluding that a sale of the 1935 Auburn had been completed between Stuckman and Wilcox because a part of the sale price had been paid to Stuckman, because Wilcox had possession of the vehicle, and because Wilcox had advanced approximately $30,000 to $40,000 for restoration of the vehicle. The trial court further concluded that Stuckman retained the valid certificate of title to the Auburn, during the entire period here at issue, as a security interest in the Auburn which he had failed to perfect by not filing the evidence of his interest in the vehicle with the Secretary of State. See M.C.L. Secs. 440.9302, 257.217, and 257.238. Accordingly, the district court denied Stuckman's motion to intervene, and permitted the IRS to proceed with the sale of the 1935 Auburn.
 
 
 24
 On appeal, Stuckman argued that the district court erred in concluding that he had completed a sale of the 1935 Auburn to Wilcox and has urged that ownership of the automobile could not transfer to Wilcox until he, Stuckman, had executed and delivered the certificate of title of the vehicle to Wilcox, the purchaser.
 
 
 25
 Under Michigan law, a certificate of title remains valid unless canceled by the Secretary of State for cause or upon transfer of an interest shown on the title. M.C.L. Sec. 257.226(7) provides:
 
 
 26
 (7) A certificate of title shall remain valid until canceled by the secretary of state for cause or upon a transfer of an interest shown on the certificate of title.
 
 
 27
 Accordingly, Stuckman retained a valid certificate of title to the 1935 Auburn which had not been transferred to Wilcox.
 
 
 28
 Since the title to the Auburn held by Stuckman was valid, no transfer of ownership of the automobile could have occurred under Michigan statutes until the title holder, Stuckman, executed and delivered the certificate of title to the vehicle to the new owner, Wilcox. M.C.L. Sec. 257.233;[4] Basgall v. Kovach, 156 Mich.App. 323, 401 N.W.2d 638 (1986). "A person who is an owner by virtue of being named on the certificate of title cannot transfer ownership unless all of the requirements of M.C.L. [Sec.] 257.233 ... are met." Basgall, 156 Mich.App. at 327, 401 N.W.2d at 640; accord Peters v. Dep't of State Highways, 66 Mich.App. 560, 239 N.W.2d 662 (1976); Gazdecki v. Cargill, 28 Mich.App. 128, 183 N.W.2d 805 (1970).
 
 
 29
 Failure to comply with the statutory requirements that the seller endorse and deliver the certificate of title render the transaction void. Bayer v. Jackson City Bank & Trust Co., 335 Mich. 99, 105, 55 N.W.2d 746 (1952); Whitcraft v. Wolfe, 148 Mich.App. 40, 384 N.W.2d 400 (1985). The court in Whitcraft stated:
 
 
 30
 While the Uniform Commercial Code (UCC) governs the sale of goods, where the specific goods involved are automobiles, the UCC's provisions must be reconciled with those of the Michigan Vehicle Code (MVC). The UCC does not govern the means by which automobile ownership is transferred except perhaps where the MVC contains no applicable law. Messer v. Averill, 28 Mich.App. 62, 66, 183 N.W.2d 802 (1970), lv. den. 384 Mich. 808 (1971). The MVC preempts the UCC in regard to transfers of ownership. Colonial Dodge Inc. v. Miller (On Rehearing), 121 Mich.App. 466, 475, 328 N.W.2d 678 (1982), rev'd on other grounds, 420 Mich. 452, 362 N.W.2d 704 (1984). The MVC title transfer provisions require an owner or dealer to endorse on the back of the certificate of title an assignment of the title and to deliver such certificate to the purchaser at the time of delivery of the vehicle.... Failure to comply with the statutory requirements relating to endorsement and delivery of the certificate of title renders the transaction void .... If the transfer is void, the seller remains the owner.
 
 
 31
 Whitcraft, 148 Mich.App. at 50, 384 N.W.2d at 404-405 (emphasis added).
 
 
 32
 In the case at bar, it is undisputed that Stuckman had never endorsed and delivered the certificate of title to the Auburn to Wilcox. Because no title had been effectively transferred to Wilcox, the sale of the Auburn to Wilcox was void. Basgall, 156 Mich.App. at 327, 401 N.W.2d at 640 (ex-wife who failed to transfer title of automobile to her former husband following entry of divorce judgment continued to be the owner of the vehicle); Mich. Mutual Auto Ins. Co. v. Reddig, 129 Mich.App. 631, 341 N.W.2d 847 (1983) (failure to deliver certificate of title voided the sale and the seller remained the owner of the vehicle). The payments made by Wilcox and the possession and control of the vehicle exercised by Wilcox, if any, was of no significance if the title had not been endorsed by Stuckman and delivered to Wilcox. Consequently, the district court erred in concluding that, from the limited evidence developed by the available record in the instant case, a sale of the 1935 Auburn had been consummated between the parties.
 
 
 33
 Accordingly, the judgment of the district court in denying Stuckman's motion to intervene is REVERSED and this matter is REMANDED to more fully develop the legal and equitable ownership interests of the respective parties consistent with this opinion.
 
 
 
 [1]
 Additional plaintiffs-appellants are William G. Wilcox, D.O., P.C. and Employees' Defined Benefit Pension Trust
 
 
 [2]
 On September 21, 1988, the district court approved a settlement reached between the IRS and Rubenstein, Issacs, Bordman and Lax Corp
 
 
 [3]
 Wilcox has also appealed the district court's denial of his motion for a preliminary injunction to enjoin the IRS from seizing the corporation's and pension trust's assets. A movant is entitled to a preliminary injunction only if he can establish (1) a probability of success on the merits, (2) irreparable harm, (3) no harm to third parties by the preliminary injunction, and (4) furtherance of the public interest. NAACP v. City of Mansfield, Ohio, 866 F.2d 162, 166 (6th Cir.1989); Frisch's Restaurant, Inc. v. Shoney's Inc., 759 F.2d 1261, 1263 (6th Cir.1985); In re DeLorean Motors Co., 755 F.2d 1223 (6th Cir.1985). The district court properly determined that Wilcox was not entitled to a preliminary injunction because he had not demonstrated that irreparable harm would result from the seizure and sale of his 1981 pick-up truck. The truck was neither unique nor essential to the preservation of the pension trust assets. Moreover, as the district court properly concluded, Wilcox was unlikely to succeed on the merits of that claim. Accordingly, the district court did not abuse its discretion in denying Wilcox's motion for a preliminary injunction
 
 
 [4]
 M.C.L. Sec. 257.233 provides in pertinent part:
 (4) The owner shall indorse on the back of the certificate of title an assignment of the title with warranty of title in the form printed on the certificate with a statement of all security interest in the vehicle or in accessories on the vehicle and deliver or cause the delivery to the purchaser or transferee of the vehicle. The certificate shall show the payment or satisfaction of any security interest as shown on the original title.
 (5) Upon the delivery of a motor vehicle and the transfer, sale, or assignment of the title or interest in a motor vehicle by a person, including a dealer, the effective date of the transfer of title or interest in the vehicle shall be the date of execution of either the application for title or the certificate of title.