RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0163p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

BOONE COUNTY REPUBLICAN PARTY EXECUTIVE
COMMITTEE, HARDIN COUNTY REPUBLICAN PARTY
EXECUTIVE COMMITTEE, and JESSAMINE COUNTY
REPUBLICAN PARTY EXECUTIVE COMMITTEE,

            *Plaintiffs-Appellants*,

    *v.*

H. DAVID WALLACE, LAURA M. BENNETT, JESSICA
BURKE, RICHARD CLAYTON LARKIN, ADRIAN M.
MENDIONDO, THOMAS PATRICK O'BRIEN, III, J.
BISSELL ROBERTS, and JOHN ROBERT STEFFEN, in their
official capacities as board members of the Kentucky
Registry of Election Finance,

            *Defendants-Appellees*.

> No. 24-5783

───────────────

On Petition for Rehearing En Banc
United States District Court for the Eastern District of Kentucky at Frankfort.
No. 3:24-cv-00049—Gregory F. Van Tatenhove, District Judge.

Decided and Filed:  June 20, 2025

Before:  MOORE, GILMAN, and GRIFFIN, Circuit Judges.

───────────────

## COUNSEL

**ON PETITION FOR REHEARING EN BANC:** Christopher Wiest, Theodore J. Roberts, CHRIS WIEST, ATTY AT LAW, PLLC, Covington, Kentucky, Thomas B. Bruns, BRUNS CONNELL VOLLMAR & ARMSTRONG LLC, Cincinnati, Ohio, for Appellants. **ON RESPONSE:** Leslie M. Saunders, KENTUCKY REGISTRY OF ELECTION FINANCE, Frankfort, Kentucky, for Appellees. **ON AMICI BRIEFS:** Brett R. Nolan, INSTITUTE FOR FREE SPEECH, Washington, D.C., Josiah Contarino, DHILLON LAW GROUP, INC., Alexandria, Virginia, Matthew F. Kuhn, John H. Heyburn, Elizabeth Hedges, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Amici Curiae.

The court delivered an ORDER denying the petition for rehearing en banc.  MOORE (pp. 3–4), READLER (pp. 5–9), and MURPHY (pp. 10–11), JJ., delivered separate opinions concurring in the denial of the petition for rehearing en banc.  SUTTON, C.J., concurred in the separate opinion of MURPHY, J.  NALBANDIAN, J. (pp. 12–15), delivered a separate opinion dissenting from the denial of rehearing en banc, in which GRIFFIN and BUSH, JJ., concurred.

--------------------

## ORDER

--------------------

The court received a petition for rehearing en banc.  The original panel has reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision.  Judge Griffin would grant the petition for the reasons stated in his dissent to the court's opinion of March 18, 2025.

The petition was then circulated to the full court.  Less than a majority of the judges voted in favor of rehearing en banc.

Therefore, the petition is denied.

_____

**CONCURRENCE**

_____

KAREN NELSON MOORE, Circuit Judge, concurring in the denial of rehearing en banc. "The nature of judicial review constrains us to consider the case that is actually before us." *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 547 (1991) (Blackmun, J., concurring in the judgment). In this case, the executive committees of three Kentucky political parties alleged that they had raised money for the specific purpose of funding campaign literature advocating for their preferred candidates and for a constitutional amendment on the November 2024 ballot. *See* R. 1 (Compl. ¶¶ 16, 20–24) (Page ID #6–7) (noting that each executive committee raised approximately $10,000 or $20,000 "for the purpose of running Joint Expenditures"). The Kentucky Registry of Election Finance told the executive committees that they could spend the money they raised to advocate on ballot issues. *See* R. 25 (PI Hr'g Tr. at 7) (Page ID #239). The executive committees just needed to register as a political issues committee and comply with the corresponding disclosure requirements, like anyone who seeks to support a ballot issue election in Kentucky. *See id.*; R. 1-4 (Email Exchange at 3) (Page ID #26). The political issues committees could share the executive committee's name and board membership. *See* R. 25 (PI Hr'g Tr. at 39–40) (Page ID #271–72). And they could fund flyers advertising issues and candidates jointly with the executive committee. *Id.* at 16 (Page ID #248). In short, the executive committees could do exactly what they wanted to do, as long as they complied with state registration and disclosure requirements. *See Boone Cnty. Republican Party Exec. Comm. v. Wallace*, 132 F.4th 406, 412–13, 424–25 (6th Cir. 2025) ("*Boone County*").

The dissent from the denial of en banc rehearing rewrites the factual record. In its telling, the Registry banned the executive committees from spending their general treasury funds to support the ballot issue and thereby unconstitutionally banned their speech. Yet, the executive committees never alleged an intention to spend their general treasury funds on ballot issues. So, not only did the panel not reach that question, but also the record does not support the view that the executive committees hold (much less planned to expend) discretionary funds. Indeed, the very limited evidence in the record suggests that, outside of this election, Kentucky's executive

committees usually collect funds for the purpose of supporting candidates, not issues.  *See* R. 1-4 (Email Exchange at 3) (Page ID #26) (noting that the Registry identified "12,000 line items of expenditures, back to 2022 . . . [and] found only seven that reflect party spending on issues"); *see also Boone County*, 132 F.4th at 412 (recognizing that the stated purpose of two of the executive committees is "support[ing] or oppos[ing] KY candidates" (alteration in original)).  The Constitution does not "require[] the Registry to allow the executive committees to spend money supporting a proposed state constitutional amendment when that money was collected to support party nominees." *Id.* at 423.

The case was presented in an emergency posture on a limited factual record.  Discovery may elucidate the character of the executive committees, the purpose for which they raise funds, the relationship between spending on ballot issues and on candidates, and the burdens imposed by registering a political issues committee.  All these considerations could affect the result at final judgment.  For now, "our task here is to decide the case before us." *Chavez-Meza v. United States*, 585 U.S. 109, 120 (2018).  The en banc court correctly denies rehearing and allows this case to proceed in the district court.  I concur.

_____

**CONCURRENCE**

_____

READLER, Circuit Judge, concurring in the denial of rehearing en banc.  I agree with Judge Murphy that the questions presented in this case may warrant our en banc court's attention down the road.  For today's purposes, it bears noting that the panel heard this case "in an emergency posture on a limited factual record."  Moore Concurring Op. at 4.  What is more, all agree that discovery "could affect the result at final judgment."  *Id.*  It follows that the panel's opinion has little, if any, binding authority, alleviating the need for en banc review.  It remains to be seen whether future developments will make this case appropriate for the full court's consideration.

A.   Political party executive committees play a crucial role in Kentucky's political system.  Executive committees serve as nerve centers for political parties, running the parties' day to day operations and raising and spending money to promote their candidates.  32 Ky. Admin. Regs. 1:050 § 1(1).  Given the central role executive committees play in electoral politics, one would likely be surprised to learn that Kentucky law forbids them from speaking on certain political issues.  Yet that appears to be the case.  In accordance with an advisory opinion issued by the Kentucky Registry of Election Finance, the agency charged with enforcing state campaign finance regulations, the Commonwealth bars an executive committee from spending money to support or oppose state constitutional amendments or other ballot issues unless the committee registers and speaks through organizations called political issues committees.  Letter from Leslie M. Saunders, Gen. Couns., Ky. Registry of Election Fin., to Bobbie Coleman and Kim Garrison, Chairpersons, Hardin Cnty. Republican Party & Jessamine Cnty. Republican Party at 2–3 (July 8, 2024), https://perma.cc/M328-D4NF.  In other words, an executive committee cannot on its own engage in basic political activity like circulating flyers advocating for or against ballot issues before the voters.

Kentucky's approach to political speech raises a series of legal questions.  Start with the understanding that the Commonwealth's regulators appear to enforce an "outright ban" on political speech by executive committees, despite their status as political groups.  *Citizens United*

*v. FEC*, 558 U.S. 310, 337 (2010).   Doing so seems legally dubious, as regulations banning political speech generally trigger strict scrutiny.   *Id.* at 340 (evaluating the permissibility of a federal law banning speech by corporations through the lens of strict scrutiny).   That explains why the panel here initially held that the Registry's advisory opinion failed to pass constitutional muster.   *Boone Cnty. Republican Party Exec. Comm. v. Wallace*, 116 F.4th 586, 598–99 (6th Cir. 2024), *vacated*, 132 F.4th 406 (6th Cir. 2025).

True, an executive committee "can still speak" about state constitutional amendments by forming a political issues committee.   *Citizens United*, 558 U.S. at 337.   But a political issues committee is a "separate association" from an executive committee.   *Id.*   Each respective committee is its own "political entity," Tr. of Mot. Hr'g, R.25, PageID 239, 270, with its own set of officers and its own bank account.   *Boone Cnty. Republican Party Exec. Comm.*, 132 F.4th at 410–12, 422; *see also id.* at 432 (Griffin, J., dissenting).   And an executive committee, standing alone, is "absolutely" prohibited from spending its own general funds *as an executive committee* on a form of political speech.   *Austin v. Mich. Chamber of Com.*, 494 U.S. 652, 681 n.* (1990) (Scalia, J., dissenting).   That the committee may create a "different association of individuals that can" speak on ballot issues does not "alter the categorical nature of the prohibition" on the executive committee.   *McConnell v. FEC*, 540 U.S. 93, 330 (2003) (Kennedy, J., concurring in the judgment in part and dissenting in part) (citation omitted).   After all, a political issues committee's speech on ballot issues is not speech by an executive committee.   Simply put, speaking through a surrogate is not the same as speaking yourself.   *Citizens United*, 558 U.S. at 337.

With all of this in mind, I am skeptical that the advisory opinion is best understood as setting forth a disclosure rule.   *See Boone Cnty. Republican Party Exec. Comm.*, 132 F.4th at 422.   Kentucky law does not require the mere disclosure of information by established entities (here, executive committees).   It instead conditions those entities' political speech on the creation, registration, and maintenance of separate and distinct associations (here, political issues committees).   That kind of law does not neatly fit the disclosure mold.   *See e.g.*, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958); *Buckley v. Valeo*, 424 U.S. 1, 61 (1976) (per curiam); *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2379 (2021).

The out of circuit cases invoked by the panel prove the point. Take, for example, *National Organization for Marriage v. McKee*, 649 F.3d 34 (1st Cir. 2011). The state law at issue there required select organizations to register as political committees and report specified information to the government. *See, e.g.*, Me. Stat. tit. 21-A, § 1053 (2012) (repealed 2013). In holding that this law did not prohibit speech under *Citizens United*, the First Circuit emphasized that the law did "not condition political speech on the creation of a separate organization or fund." *Nat'l Org. for Marriage*, 649 F.3d at 56. Yet that is precisely what the Kentucky advisory opinion achieves. It tells executive committees they can speak about ballot questions only if they form new associations.

Had I been on the panel here, I would have rejected its unusually functionalist understanding of *Citizens United*, as did Judge Griffin. *Boone Cnty. Republican Party Exec. Comm.*, 132 F.4th at 431 (Griffin, J., dissenting). But whether the panel decision raised an issue of "exceptional importance" warranting en banc review, Fed. R. App. P. 40(b)(2)(D), was far from certain, in numerous respects. As a starting point, it is unclear how potent the panel's alternative functional test is and whether, in practice, it becomes "a workaround to *Citizens United*." Nalbandian Dissenting Op. at 12. On that note, it may be that campaign finance regulations requiring one entity to speak through another are consistent with free speech principles if they are not "burdensome." *Citizens United*, 558 U.S. at 337; Murphy Concurring Op. at 10 (citation omitted). Reading precedent in this way leads us to ask: Is it "burdensome" for executive committees to form political issues committees and speak about state constitutional amendments or other ballot issues through them? That would be the case if executive committees cannot engage in their preferred speech through political issues committees. *See Citizens United*, 558 U.S. at 337. Equally so if political issues committees are "expensive to administer and subject to extensive regulations." *Id.*

All of this spotlights the relevant questions the parties should answer as the record develops in this case. To name a few: Once executive committees form political issues committees, can they support or oppose political issues with "funds in [their] general coffers," or must they instead "start from scratch in raising the funds"? Murphy Concurring Op. at 11. And can executive committees engage in their preferred speech once they register political issues

committees?  That is, can they circulate flyers supporting *both* political candidates *and* political issues?

Eventually, these many issues may need the attention of our en banc court.  That this case comes to the full court today with an underdeveloped record, however, again deserves emphasizing.  Moore Concurring Op. at 4.  At this point, it makes sense to return the case to the district court for further development.  Following discovery, the district court will pass judgment on the issues just described, followed, I presume, by the panel.  And as two members of the panel have changed their view of the case once already, it very much remains to be seen whether the regulation at issue, in the end, violates free speech principles, and whether that question will merit an answer by the full court.  *Compare Boone Cnty. Republican Party Exec. Comm.*, 116 F.4th at 598 *with Boone Cnty. Republican Party Exec. Comm.*, 132 F.4th at 442.

B.  While not the focus of the litigants here, other potential serious First Amendment concerns lurk in the background even if we could view Kentucky's scheme as a mere disclosure requirement, as did the panel.  *Boone Cnty. Republican Party Exec. Comm.*, 132 F.4th at 428.  The crux of appellants' speaker based discrimination claim was on the distinction between regulating large associations of individuals (like executive committees) while allowing single or two person entities to go unregulated.  *See* Appellants' Br. at 23–25.  Appellants are correct that speaker based distinctions can warrant heightened scrutiny.  But that axiom is not automatic.  *See Schickel v. Dilger*, 925 F.3d 858, 876 (6th Cir. 2019).  Instead, whether a law that favors "some speakers over others" demands closer review depends on whether the distinction between speakers reflects a content preference.  *Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015) (citation omitted).  It is not obvious to me that Kentucky merely choosing to regulate larger associations while ignoring more minor players evinces a content preference.  After all, focusing oversight on larger entities seems part and parcel with the content neutral goals of "transparency and ensuring that the public is informed about who is supporting and opposing ballot initiatives." *Boone Cnty. Republican Party Exec. Comm.*, 132 F.4th at 428.

But in the Bluegrass State, more seems to lurk beneath the surface as to who is subject to its political issues committee regulations.  The Commonwealth, it bears noting, is happy to exempt from its regulations other large associations organized under a single corporate form,

whether it be churches or media corporations.  *See* Letter from Rosemary F. Center, Gen. Couns., Ky. Registry of Election Fin., to Stewart E. Conner at 2 (Sept. 29, 2004), https://perma.cc/QLV9-5LKW; Letter from Emily Dennis, Gen. Couns., Ky. Registry of Election Fin., to Theresa Camoriano at 2 (Jan. 3, 2011), https://perma.cc/AMU5-XQU7.  By all accounts, in other words, Kentucky law seems premised less on the size of who it is regulating than it is on the reason a particular entity is organized.

Rationalizing this regulatory scheme in not easy.  Why look the other way when the *Louisville Courier Journal* publishes an op-ed discussing a proposed constitutional amendment, but look askance when the Boone County Republican Party wants to disclose its views on the same topic?  The upshot is that party executive committees seem to be disfavored organizations under Kentucky law.  And that disparity brings with it legal ramifications—including under the exacting scrutiny test the panel applied here, which requires a state disclosure requirement to be narrowly tailored to the interest it promotes.  *Ams. for Prosperity Found.*, 141 S. Ct. at 2385.  When it comes to First Amendment jurisprudence, we are "deeply skeptical" when a state creates exemptions to its disclosure laws that are "wholly disconnected" from the content-neutral informational interests supporting the law.  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2377–78 (2018); *Citizens United v. Gessler*, 773 F.3d 200, 217 (10th Cir. 2014); *Ctr. for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270, 289–90 (4th Cir. 2013).  That is so because such exemptions "run the risk that '[a] State has left unburdened those speakers whose messages are in accord with its own views.'"  *Nat'l Inst. of Fam. & Life Advocs.*, 138 S. Ct. at 2378 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 580 (2011)).  The risks to free speech are all the more pronounced here when one remembers that the entities being targeted are political parties, critical voices in our national policy dialogue.  *See Nat'l Republican Senatorial Comm. v. FEC*, 117 F.4th 389, 444 (6th Cir. 2024) (en banc) (Readler, J., dissenting) (noting unique role of political parties).

---

**CONCURRENCE**

---

MURPHY, Circuit Judge, concurring in the denial of rehearing en banc. This case may eventually raise an issue of exceptional importance warranting our full court's attention. After all, the First Amendment "has its fullest and most urgent application" for political speech in the election context—whether that speech promotes candidates or issues on the ballot. *Citizens United v. FEC*, 558 U.S. 310, 339 (2010) (citation omitted). And here, the Kentucky Registry of Election Finance has told the executive committees of county political parties that they may not spend money promoting or criticizing state constitutional amendments on the ballot unless they do so through a separate "political issues committee." *See Boone Cnty. Republican Party Exec. Comm. v. Wallace*, 132 F.4th 406, 412–13 (6th Cir. 2025). If this requirement to form a political issues committee substantially burdens a political party's ability to endorse both candidates and issues on the same mailer, the Registry's actions would raise serious constitutional questions. As Judge Griffin explained, political parties are at least entitled to the same First Amendment protections as corporations. *See id.* at 434 (Griffin, J., dissenting). And the Supreme Court has held that federal campaign laws violated the First Amendment when those laws required the corporations to speak only through "burdensome" political action committees. *Citizens United*, 558 U.S. at 337.

In my view, though, two countervailing considerations cut against en banc review at this time. For one thing, the executive committees in this case have already obtained the preliminary relief that they sought: an injunction allowing them to distribute their preferred communications ahead of the November 2024 election. *See Boone Cnty.*, 132 F.4th at 414. But that election has come and gone. Although this case may well not be moot, the committees do not identify any upcoming election in which they would like to engage in similar speech. *Cf. Fischer v. Thomas*, 78 F.4th 864, 868 (6th Cir. 2023). So it is hard to see any continued need for *preliminary* relief while they litigate this case to a final judgment in the district court. *See Boone Cnty.*, 132 F.4th at 430. And if another election arises during this litigation, the committees can always "renew their request for preliminary relief then." *Fischer*, 78 F.4th at 868.

For another thing, the record created for this appeal is not ideal—understandably so, since the appeal arose on an emergency basis. The briefing leaves me uncertain over the actual burdens imposed on political expression by the requirement that executive committees register a political issues committee to speak about state constitutional amendments on the ballot. The panel opinion thought that the Registry's requirement imposed mere disclosure obligations like those that other courts have upheld. *See Boone Cnty.*, 132 F.4th at 421–28. But I have a lot of questions on this front. Consider a typical joint mailer like the one at issue in this case. May an executive committee use funds in its general coffers to promote a constitutional amendment? Or must it start from scratch in raising the funds for this speech? And what about joint fundraising for both candidates and issues? Apart from fundraising, how would the Registry even earmark how much of the expenses for this mailer must come from the executive committee and how much must come from the political issues committee? Questions like these may matter in the end. And if this case reaches us after discovery, the parties will have likely clarified the speech burdens in practice. That fact could make for a more informed decision on the key issue: Do the political issues committees in Kentucky resemble the types of political action committees that *Citizens United* found overly burdensome? 558 U.S. at 337. Or do they resemble the types of disclosure regimes that other courts have upheld? *Boone Cnty.*, 132 F.4th at 422 (citing cases).

On this understanding, I concur in the order denying rehearing en banc.

———————————

**DISSENT**

———————————

NALBANDIAN, Circuit Judge, dissenting from the denial of rehearing en banc.  In *Citizens United v. FEC*, the Supreme Court held that the government can't ban organizations "from using their general treasury funds" for political speech.  558 U.S. 310, 318–19, 365–66 (2010).  But the panel's opinion in this case permits Kentucky to do just that, greenlighting a workaround to *Citizens United*.  Under the panel's approach, a state can ban political parties from using general funds for political speech so long as the state frames its rules as "disclosure rules," not spending rules.

"[W]hat cannot be done directly cannot be done indirectly.  The Constitution deals with substance, not shadows . . . ."  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) (alteration in original) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1867)).  Because the panel opinion gives other states a potential roadmap to evade *Citizens United*, I would've granted en banc review.

\*        \*        \*

Under Kentucky law, political parties generally operate through "executive committees," which run the party bank accounts and authorize general spending.  But to speak out and spend money on a proposed state constitutional amendment, a party must create and register a separate "political issues committee."  *See Boone Cnty. Republican Party Exec. Comm. v. Wallace*, 132 F.4th 406, 410–12 (6th Cir. 2025) (describing the regulatory regime).

This new, separate committee must have a new, separate bank account that can only spend new, separate money raised for the purpose of supporting a specific political issue.  In other words, a political party cannot spend money that it's already raised—its general treasury funds—on issue advocacy.  So when a political party raises funds or receives general donations, it can spend that money on some political speech (i.e., candidates), but not other political speech (i.e., ballot initiatives).

That's a ban on using resources for a particular form of political speech. Just look at the Boone County Republican Party. In early 2024, the Party had $50,000 in general funds. Then, a proposed state constitutional amendment to authorize school choice was added to the 2024 ballot. *See* App. Dkt. 44, Amicus Br. of Institute for Free Speech 7–8. But the State said that the Party couldn't use any of its money to support the school choice amendment, because the money hadn't been raised by its (nonexistent) political issues committee for the specific purpose of supporting the amendment (which hadn't previously been on the ballot). To support the school choice initiative, the Party would have to create a new committee, raise new money, ask its donors to give again, and have the new money earmarked only for the amendment.

*Citizens United* should have governed here. By putting a political party's general funds off limits for core political speech, Kentucky's regime violates the First Amendment. 558 U.S. at 318–19, 365–66; *see also FEC v. Cruz*, 596 U.S. 289, 302–03 (2022) ("[R]estricting the sources of funds" that an organization can use for political speech "burden[s] core political speech"). I share the panel dissent's view that Kentucky is "suppress[ing] pure political speech." *Boone Cnty.*, 132 F.4th at 431 (Griffin, J., dissenting).

The panel majority found otherwise. It reasoned that Kentucky's requirements are more of a "disclosure regime" than a ban on speech, and thus subject to less demanding scrutiny. *Id.* at 421–28 (majority opinion). All a party has to do is set up a separate committee, and then it can speak (and spend money) on political issues (not candidates). But what about the new committee's funding? Well, the majority explained, nothing prevents the party "from contributing to a political issues committee [the] funds" that the party "collected for the purpose of supporting or opposing [a political] issue." *Id.* at 423.

Therein lies the rub. Only funds collected "*for the purpose of supporting or opposing [an] issue*" can be spent on a political issue. The majority doesn't come out and say it directly, but other funds—i.e., general funds, preexisting funds, funds not earmarked for any purpose, funds given to the party to be spent as the party sees fit, *most funds—cannot* be spent on issue advocacy.

To say that such a rule is only about "disclosure" and doesn't ban speech "ignores reality." *Id.* at 436 (Griffin, J., dissenting). That's like saying you can only spend on groceries the portion of your paycheck specifically earmarked for groceries. Since employers don't earmark money in your paycheck for groceries, such a rule would effectively ban you from buying groceries. That's not really how paychecks work, and I'm skeptical that it's really how political donations work, either.

Importantly, I'm also skeptical that such a rule fits with Supreme Court caselaw. Indeed, if we applied the panel's decision to the facts of *Citizens United* itself, perhaps the government *could* ban corporations from contributing their general treasury funds to a PAC, so long as the PAC could raise money from other sources.

Fortunately, the case isn't over. Preliminary injunctions generally don't establish law of the case, and parties may continue on to the merits, further developing the record and litigating to final judgment. *See Hall v. Edgewood Partners Ins. Ctr.*, 758 F. App'x 392, 397 n.3 (6th Cir. 2018); *Wilcox v. United States*, 888 F.2d 1111, 1114 (6th Cir. 1989) (per curiam); *cf. Lackey v. Stinnie*, 145 S. Ct. 659, 667–68 (2025). Assuming they do so here, I expect the First Amendment issues to be presented again. We should then "stand ready to ensure" that these issues are given full review—including, if necessary, by the en banc court. *Brown v. Yost*, 122 F.4th 597, 603 (6th Cir. 2024) (en banc) (per curiam).

Still, I would've taken the case now, rather than wait for the next election or final judgment. True, the 2024 cycle has passed. But that didn't stop the panel from deciding the merits on a preliminary-relief posture. So I doubt that posture should now insulate the panel's opinion from further scrutiny. We regularly take preliminary-relief cases en banc. *See, e.g.*, *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 109 F.4th 453, 461 (6th Cir.), *reh'g en banc granted*, 120 F.4th 536 (6th Cir. 2024) (mem.); *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 898 (6th Cir. 2021) (en banc) (opinion in support of affirmance); *Preterm-Cleveland v. McCloud*, 994 F.3d 512, 516 (6th Cir. 2021) (en banc); *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 327 (6th Cir. 2009) (en banc). And although an election isn't coming up in the next few months, a political party must raise money year round, from the

same limited donor pool, whether it's an election year or not.  The parties here should have clarity on their spending and speech rights.

I respectfully dissent.

ENTERED BY ORDER OF THE COURT

_Kelly L. Stephens_

_____

Kelly L. Stephens, Clerk